In the Matter of FRANCIS T. ROPIECKI, an Attorney, Respondent.

Fourth Department, November 13, 1935.

*Earle C. Bastow, Assistant District Attorney,* for the petitioner.

*Arthur J. Foley,* for the respondent.

EDGCOMB, J. This is a disciplinary proceeding. Respondent has been charged with converting to his own use money which belonged to his clients, and which was turned over to him for a specific purpose. We regret to say that we are forced to the conclusion that he is guilty of the accusations made against him.

A disciplinary proceeding is in no sense a criminal one, and

the statutory rules relating to the presumption of innocence and the burden of establishing the respondent's guilt beyond a reasonable doubt do not apply. (*Matter of Randel*, 158 N. Y. 216; *Matter of Spenser*, 143 App. Div. 229, 236; affd., 203 N. Y. 613.)

The proper limits to an opinion forbid more than brief reference to the outstanding features of the various intricate transactions involved, but that does not mean that we have not carefully considered all of the evidence.

On March 1, 1929, John Kalwara and Lawrence Soja purchased from Aniela Wolak certain real property in the city of Utica for the sum of $10,500. Five hundred dollars was paid to the owner to bind the bargain, and the balance, together with an additional sum of $120 to cover certain expenses connected with the transfer, was paid to Mr. Ropiecki, whom the purchasers had retained to look after their interests in the transaction, for the purpose of closing the deal. Respondent, according to his own admission, has paid out of this amount the sum of $9,069.22 in the discharge of certain mortgages, judgments, taxes and insurance on said property, leaving $1,050.78 in his hands, which he has refused to pay to his clients, or to use toward the discharge of the unpaid liens against the property, and which he now claims he is entitled to retain as payment for certain legal services. Complainants insist that the amount disbursed by the respondent is less than he admits, and that the balance in his hands is correspondingly greater, but for the purposes of this proceeding we accept Mr. Ropiecki's figures.

It is only fair to state that, owing to a misunderstanding as to the amount of taxes which were to be assumed by the purchasers, some delay necessarily arose in closing the transaction. Within a day or two after this money was paid to Mr. Ropiecki, he paid $7,889 to the holders of two mortgages, and obtained a discharge of the liens. Other sums were disbursed from time to time up to October, 1929. A deed to the property has since been delivered to the purchasers, but the outstanding liens against it far exceed the balance of the money retained by respondent.

This money which was paid to Mr. Ropiecki was in the nature of a trust fund, and should have been held by him as such. The rule is well settled, and has been repeated and reiterated time and again, that where money has been deposited with an attorney for a specific purpose, he holds it as trustee, and is under a strict obligation to keep it separate and apart from his own funds. If he fails so to do, and uses it as his own, he violates his solemn duty, and lays himself open to discipline. (*Matter of Powers*, 235 App. Div. 382, 384; *Matter of Babcock*, 230 id. 323; *Matter of Maged*, 163 id. 880; *Matter of Dobbs*, 173 id. 605; *Matter of Cohn*, 141 id. 511; *Matter of Menzel*, 216 id. 176.)

As was stated by this court in *Matter of Babcock* (230 App. Div. 323, at p. 325): " This rule has been stated and emphasized so many times that repetition ought to be unnecessary, and excuses for its violation should be ignored."

The Canons of Professional Ethics of the American Bar Association, which every applicant of the bar is now required to read, and to which he must give his assent before he is admitted, prescribe that money of a client should never be commingled with the lawyer's private property, or be used by him except with the client's knowledge and consent.

In defiance of this well-known and firmly established principle, respondent, on the 4th day of March, 1929, deposited the money he received from his clients in his own individual account in the Oneida County National Bank and Trust Company of Utica. This deposit gave him a balance on that day of $10,053.30. Fourteen days later he had an overdraft of $24.26, notwithstanding the fact that three deposits, aggregating $727.06, were made in the meantime. This money was withdrawn by forty-six separate checks, none of which, with the exception of the one for $7,889, appears to have been made for any purpose connected with the transaction in question. The only possible conclusion which can logically be drawn from this situation is that Mr. Ropiecki commingled these trust funds with his own private property, and, with the exception of the sum of $7,889, used the money as his own, and converted it to his own personal use.

But respondent claims he kept the unpaid balance of his clients' money in cash in the safe in his office, properly ear-marked. If this statement is true, and if he is now ready to account for the balance in his hands, he cannot be charged with professional misconduct. But we find great difficulty in believing his story. In judging the truth or falsity of any statement, one necessarily invokes the rule of reason, and the general custom prevalent at the time. It taxes one's credulity to the breaking point to accept this most unusual explanation of the respondent. Especially is that so when we search Mr. Ropiecki's bank account in vain for any evidence of a withdrawal of an amount anywhere near equal to this balance which he claims to have retained in his hands, and which it would seem, if his story is true, he would have withdrawn in order to have the cash to put in his safe. The largest withdrawal at any one time within the fourteen days above mentioned, outside of the $7,889, was $164.85.

Moreover, the respondent paid Mrs. Wolak $625 in October, 1929, to discharge a judgment in the County Court against his clients, and which he claims was a proper disbursement out of

the moneys supposed to be in his hands at the time. He did not take this sum out of the cash in his safe, as he naturally would have done if it had been there, but withdrew it from his special account in the Oneida County National Bank and Trust Company by his own check.

These circumstances make it impossible to give credence to Mr. Ropiecki's story. But if there was any doubt in the matter, it would seem to be dispelled by the evidence of two detectives attached to the Utica police force, who say that in 1934 they were assigned to investigate an alleged robbery in respondent's office, and that Mr. Ropiecki told them at that time that he had seventy-three dollars in the safe. True, respondent denies this statement, and asserts that there was at the time of the robbery cash in his safe, properly ear-marked, for the full amount of the unpaid balance due Kalwara and Soja. We regret to say that we cannot accept Mr. Ropiecki's statement in this particular.

But respondent seeks to avoid the charge of conversion by the assertion that the nature of this fund changed after the money had been paid over to him. He says that when it was discovered that the taxes which his clients agreed to pay exceeded the amount mentioned at the time, the petitioners instructed him not to pay out any more of this money in discharge of the liens against the property, but to retain it in payment of his services in litigation to be instituted to protect their rights. If that is true, Mr. Ropiecki was justified in the course which he pursued. In certain litigation which followed the neglect of the purchasers to fulfill their contract of sale, Mr. Ropiecki appeared for the purchasers. There is evidence that his services in that connection were worth all that he had in his hands at that time. The complainants deny that they ever told the respondent that they would rather fight than to use the money to pay the existing liens against the property as far as it would go, or that they ever told him to keep the money for his services. Much as we regret to say it, we are forced to believe the complainants rather than Mr. Ropiecki. His story is unlikely, and does not ring true.

We are constrained, therefore, to hold that respondent has commingled money of his clients with his own private property, and has used and converted to his own use the sum of $1,050.78, trust moneys paid over to him by Kalwara and Soja to be expended for a specific purpose.

A second charge is made against the respondent, growing out of the Kalwara and Soja matter. It is claimed that in June, 1932, respondent borrowed from Mr. Soja the sum of $2,500 for the express purpose of paying the outstanding liens against the

Wolak property, and that he failed to use it for that end. Concededly, Soja gave respondent that amount on June 4, 1932, and Ropiecki deposited it in his special account in the First Bank and Trust Company of Utica, and gave back a three months' note, payable at the Utica Savings Bank, with an assignment of an insurance policy on the life of one Joseph Wadas, in which said policy respondent was named as beneficiary, as collateral security. None of this money was used to pay any of the liens on the Wolak property. Respondent's bank statement shows that the entire sum was withdrawn between June 4 and June 25, 1932, by thirty-two separate checks.

Respondent now claims that this transaction was not a loan, but a sale of the insurance policy to Mr. Soja. He explains the note and the collateral assignment of the policy by saying that he consented to let Mr. Soja have this policy, upon the condition that Wadas, who was ill at the time, should live more than three months, but if he died within that period he, Ropiecki, was to return the $2,500 to Soja, with interest thereon, and that as evidence of such agreement he gave the note in question. This claim is denied by both Mr. and Mrs. Soja. If in reality the arrangement was as now claimed by Ropiecki, it is difficult to conceive how he, an experienced lawyer, would have given a note, absolute on its face, which could easily have been discounted by the payee, and to which, if it had been transferred to a *bona fide* holder for value before maturity, Ropiecki would have had no defense.

We accept Mr. Soja's story as to the nature of this transaction.

When the loan was made the money became Mr. Ropiecki's, and, strictly speaking, he could use it as he saw fit. It did not constitute a trust fund. However, respondent was borrowing from his client. He did not have money enough in his hands to pay the liens against the property which his clients were purchasing. If Soja had thought that the money was not going to be expended for his benefit, it is very doubtful if he would have made this loan. Under these circumstances Mr. Ropiecki owed a duty to be frank with his client, and he cannot escape censure by a plea that the money was a loan, and did not constitute a trust fund, and that he could, therefore, use it as he saw fit.

Another charge has been lodged against the respondent. He is accused by Thomas Osieka and Victoria Sas Osieka of converting to his own use $2,000, which they gave him to be used in the payment of a part of the purchase price of certain property which they had agreed to buy from the West End Brewing Company of Utica.

In the summer of 1932 negotiations were entered into between Mr. and Mrs. Osieka with the brewery for the purchase of this real estate, and Mr. Ropiecki was retained to look after their interests in connection therewith. Petitioners assert that the price of the property agreed upon was $10,000, $2,000 of which was to be paid in cash, and the balance to be represented by a purchase-money mortgage. They say that they gave this $2,000 to Mr. Ropiecki to be turned over by him to the owner at the proper time. Concededly, Mr. Ropiecki never paid this money to the brewery, and the Osiekas, who at the time were tenants, were subsequently ejected. Mr. Ropiecki admits that he received $1,000 on July 27, 1932, but he asserts that this payment was made to apply upon his account against Mr. Osieka for legal services. Respondent's story is that he refused Mr. Osieka's retainer to look after his interests in the purchase of this property, unless Osieka paid at least $1,000 for past services. Respondent says that Osieka and his future wife, then Mrs. Sas, brought to him on July 27, 1932, a cashier's check, payable to Mrs. Sas, for $1,000, and that he, Ropiecki, had the check cashed and handed the money over to Mrs. Sas, who in turn delivered it to Mr. Osieka, and that Osieka handed it back to the respondent, with the statement that that was to apply upon his bill for legal services. Respondent then consented to look after Osieka's interest in this real estate transaction for an additional consideration. It is rather difficult to credit such a fantastic story. In so simple and unimportant a matter as a real estate deal of this character, it is not easy to conceive that a woman would advance to her *fiancé* $1,000 to enable him to obtain the services of Mr. Ropiecki. On February 18, 1933, another cashier's check, made payable to Mr. Osieka and Victoria Sas for $1,250, came into Mr. Ropiecki's hands. There is ample evidence to show that he received the entire proceeds of this check.

Respondent admits that he had numerous negotiations with the officials of the brewery relative to the purchase of this property, but he says that the reason why the transaction was never closed was because the owner kept raising the price of the property. This is denied by the officials of the brewery. They say that the price was fixed in the fall of 1932 at the sum of $10,000, $2,000 in cash and $8,000 in the form of a purchase-money mortgage, and was never changed thereafter. Mr. Matt, the president of the brewery, testifies that he repeatedly urged the respondent to close this transaction, but that the latter kept putting him off with the plea that he was very busy in trial work and other important legal matters. The attorneys for the corporation also wrote Mr. Ropiecki

several letters, insisting that the deal be closed, or that proceedings would be instituted to dispossess Mr. Osieka. The veracity of Mr. Ropiecki is seriously questioned. We can see no reason why the officials of the brewery should have any incentive to misrepresent the facts in this matter, and we have no hesitancy in believing their story where it contradicts that of the respondent.

On September 14, 1933, respondent gave Mrs. Osieka his check for $2,000. At that time he had but $243.55 in the account on which the check was drawn, and but $3.52 in his other account. At the same time Mrs. Osieka gave him two notes, one for $1,700 payable on demand, and the other for $300 payable one month after date. Respondent's explanation of this most peculiar transaction is not satisfactory. Whatever may have been its purpose, we reach the conclusion that it had no connection with the original delivery of the $2,000 to Mr. Ropiecki to be used as the down payment on the property which the Osiekas were about to purchase.

We accordingly find that respondent has converted to his own use $2,000 paid to him by the Osiekas to be used as the down payment of the purchase price of the property they were seeking to buy from the West End Brewing Company.

Having reached the conclusion that the respondent has been guilty of professional misconduct in the three matters above discussed, we now come to the question of punishment. This is always a troublesome and unpleasant matter.

A disciplinary proceeding is not brought for the sole purpose of discipline or punishment. It primarily concerns the fitness of the attorney to longer practice his profession. It also serves to warn other members of the bar of the fate which awaits those who are recreant to their trust. (*Matter of Bauder*, 128 App. Div. 346; *Matter of Clark*, Id. 348.)

These complainants are people of respondent's own nationality. They were ignorant of the English language, and not versed in matters of this character. They intrusted their money and their interests to the respondent, in whom they had especial confidence. He betrayed their trust, and when his perfidy was discovered he attempted to excuse his dereliction by false excuses. They have lost what to them was a large sum of money by reason of his violation of the trust reposed in him. Throughout this entire proceeding he has not shown the slightest exhibition of repentance or of good works. He has defiantly defended his course, with the apparent hope that we would accept his excuses and believe his story.

Much as we regret to say it, we are forced to the conclusion that the respondent has shown himself unfit to longer exercise the high privilege which was conferred upon him in 1923, when he was admitted to the bar, and that his franchise so to do should be revoked, and his name stricken from the roll of attorneys of this State. These are harsh words, and unpleasant to speak, but the record permits of no other conclusion.

All concur. Present — SEARS, P. J., TAYLOR, EDGCOMB, THOMPSON and CROSBY, JJ.

Order of disbarment entered.