In the Matter of HENRY L. CRITTENDEN, an Attorney and Counselor at Law, Respondent.

Fourth Department, June 28, 1938.

*Leland R. Yost*, for the petitioner.

*Eugene J. Dwyer*, for the respondent.

DOWLING, J. The pertinent facts out of which this proceeding arises are these. Between December 6, 1919, and March 4, 1921, Mr. Henry L. Crittenden, a member of the bar of this State, was appointed committee of the estates of five incompetent World war veterans, Hector Gurnow, Stanley Weit, James A. Mariconti, Herman Lang, Vincenzo Sementillo, by the Supreme Court of Monroe county. He accepted the appointments and qualified in each estate by giving a bond conditioned for the faithful performance of the trust reposed in him. As committee of these incompetents he received from the Federal government in the form of

compensation and war risk insurance $106,821.57, divided among the estates as follows: Gurnow, $27,402.50; Weit, $8,867.29; Mariconti, $28,014.19; Lang, $23,939.28; Sementillo, $18,598.31. Mr. Crittenden deposited the amount received in each estate in his name as committee. These sums were augmented by interest accumulations. In January, 1923, the estates were intact save the moneys necessarily disbursed for the benefit of the incompetents. Mr. Crittenden is accused by the Rochester Bar Association of misconduct in the practice of his profession. The association charges in substance that he mismanaged the above estates, in that he kept improper and inaccurate accounts and inventories, reported in his sworn annual inventories and accounts investments of which he was never possessed as committee, failed to acquire lawful security for advances or loans made from the incompetents' estates, withdrew moneys from the incompetents' accounts and deposited them in his personal account and thereafter used them for his own benefit, that he withdrew from these estates between 1919 and 1932, the sum of $44,679.87 and converted the same to his own use. Mr. Crittenden denies the charges except he admits he withdrew the money but he claims he invested the whole amount in a mortgage on the real property hereinafter mentioned.

In January, 1923, Mr. Crittenden occupied offices in the Powers Building, Rochester, N. Y. Mr. James E. Malley was a tenant in this block at that time. Mr. Malley and Mr. Crittenden were acquainted. On January 25, 1923, Malley brought to Mr. Crittenden's offices John A. Hetzler, a resident of Rochester, and introduced him to Mr. Crittenden. Hetzler was connected at the time with a concern which harvested ice from the western wide waters of the old Erie canal and sold it to the people of Rochester. Hetzler said complaints regarding the quality of this ice had been made and he was seeking facilities for the manufacture of artificial ice. He said, in substance, that the Moerlbach Brewing Company property on Emerson street, Rochester, was on the market, that the Union Trust Company of Rochester had charge of the property as trustee for three of the brewing company's largest creditors, that the property could be developed into a cold storage and artificial ice plant, that it consisted of a brewing plant, a bottling works and several acres of land. He said there would be considerable legal work in connection with the purchase and he would like to have Mr. Crittenden's services in this connection. He asked Mr. Crittenden to take up the matter with the Union Trust Company and to prepare a purchase offer. Mr. Crittenden interviewed the appropriate officer of the Union Trust Company and reported to Malley and Hetzler that the trust company would sell the property, including machinery and equipment, for $100,000, plus

taxes and carrying charges from January 11, 1923. The terms were part cash and the assumption of existing mortgages. Mr. Crittenden prepared a purchase offer which was signed by John A. Hetzler on January 25, 1923, and accepted by the Union Trust Company January 31, 1923. The date for closing was May 1, 1923. Hetzler was not required to make a down payment. At this interview Hetzler, Malley and Crittenden discussed the feasibility of organizing a corporation to promote the enterprise. Hetzler was unable to perform on the day set due to "the low state" of his finances. He instructed Mr. Crittenden to procure an extension of time. Mr. Crittenden succeeded in having the time extended to September 15, 1923. Hetzler was unable to perform on September 15, 1923, and the date for performance was extended one month.

The brewing company property was divided into lots 1, 2, 3, and 4. The main plant stood on lot 1, the bottling works on lot 3 and lots 2 and 4 were vacant land.

Hetzler conceived the idea of selling lots 2, 3, and 4 and the machinery and equipment to aid in discharging the purchase price. This proposition was submitted to the trust company and was accepted on condition that Hetzler pay $5,000 in cash on the contract and apply all the proceeds from sales made on the purchase price. Hetzler borrowed $6,000 from the Genesee Valley Trust Company on his note indorsed by a friend and paid $5,000 to the trust company as agreed. Lot 4 was sold for $18,000 and the machinery and equipment for $5,760, which amounts were applied on the purchase price.

Mr. Malley had interested a Mr. Bovanizer and a Mr. Preston in the idea of converting the building on lot 1 into a cold storage and artificial ice-making plant and they had agreed to invest $25,000 in the project. The matter was taken up with the trust company and it agreed to take back a purchase-money mortgage on lot 1 in amount of $40,000 on the completion of the improvement. With this assurance the work was begun. During the progress of this work it was decided to increase the size of the plant and this required additional capital. In the meantime Hetzler had been unable to meet his commitments and Mr. Crittenden claims he agreed, in December, 1923, to advance the necessary capital on condition Hetzler would execute to him a first mortgage as security therefor on lots 2 and 3 which Mr. Crittenden valued at $50,000. Mr. Crittenden claims the amount required to meet Hetzler's commitments was $31,000 and he considered these lots ample security under the circumstances. He claims the trust company agreed to increase its mortgage to $60,000 and assured him that its mortgage would be confined to lot 1. On this assur-

ance he says he decided to invest the incompetents' funds in lots 2 and 3. He says he did not ask that the promise of the trust company be reduced to writing because he felt confident it would be kept.

Crittenden, Malley, Bovanizer and Preston formed a syndicate to organize the Flower City Cold Storage and Ice Corporation. This fact appears in a certification signed by them August 3, 1925. The Flower City Cold Storage and Ice Corporation was incorporated about June, 1924. All four men had substantial holdings in this company. Under the syndicate the work of converting the building into a cold storage and ice plant was begun in October, 1923, and was completed in June, 1924. The trust company inspected the new plant and gave notice it was ready to close the deal. Prior to June, 1924, Hetzler assigned his contract to the Flower City Cold Storage and Ice Corporation. Mr. Crittenden claims the trust company, in violation of its promise to him, insisted that its mortgage cover the three lots. He claims he protested to the trust company and to Hetzler but Hetzler yielded to the trust company's demand. The trust company conveyed the premises to the Flower City Cold Storage and Ice Corporation on June 6, 1924, and received a purchase-money mortgage in amount of $60,000 covering the three lots. Mr. Crittenden says this breach of faith by Hetzler and the trust company placed him in an embarrassing position and the best he could do was to accept a deed in his own name of lots 2 and 3, subject to the $60,000 mortgage, on the assurance of Hetzler that an earnest effort would be made to free lots 2 and 3 from the lien of the mortgage. On November 23, 1925, the Flower City conveyed lots 2 and 3 to Mr. Crittenden personally. Mr. Crittenden claims the scene changed here from an investing to a liquidating stage. From this point on he says he devoted his entire energies to freeing lots 2 and 3 from the lien of the trust company's mortgages, that he accomplished this result in November, 1925, that he now has a first lien for $31,000 on these lots. He contends the loss to the incompetents arose from an unforeseeable decline in real estate values and not because of his failure to procure a mortgage on lots 2 and 3 at the time the money was actually invested. He says his intent at all times was to invest his wards' moneys in a mortgage on approved real estate and that he actually did so because he considered the deed to him of lots 2 and 3 a mortgage and that he took title in his own name to avoid legal proceedings in the event of a sale of the property or a foreclosure of his mortgage deed. He admits he was careless in the way he administered the funds of his wards in making this alleged investment. He claims, however, his intentions were honorable, that he in no way profited by the trans-

action, and that his carelessness under the circumstances should be overlooked. He claims he advanced the additional $13,476.87 from the incompetents' estates between June 19, 1924, and June 19, 1933, to protect the initial investment of $31,000, otherwise all might have been lost.

He testified that he advanced all of these moneys to Hetzler to be applied on the purchase price and carrying charges of the brewing company property, that none of the money went to the Flower City Cold Storage and Ice Corporation or to its successor.

He claims he passed the incompetents' funds through his Crittenden and Crittenden bank account to avoid giving a multiplicity of checks whenever he made an advancement, that he filed an annual statement in each account showing he had invested part of the estate in bond and mortgage, that he did this on the theory that the deed to him was a mortgage, that his annual statements were examined by the court and the Veterans Bureau and no criticism from either source was ever offered, that his accounts were judicially settled in 1936 and the amount of the loss in each estate was determined and that he made good the deficits in the five estates plus costs and allowances totaling $56,999.97 and procured his discharge by decree of the court in January, 1937, that by stipulation of all interested parties and the consent of the court he was exonerated from intentional wrongdoing, that under all the circumstances, the charges of professional misconduct lodged against him should be dismissed.

The undisputed facts make it impossible for us to accept Mr. Crittenden's claim that he advanced $44,679.87 from the estates of his wards to John A. Hetzler and that he, Crittenden, acted at all times for Hetzler and that he had no personal interest either in the brewing company property or the Flower City Cold Storage and Ice Corporation or its successor, The Rochester Cold Storage and Ice Corporation. The fact is that Hetzler had very little to do with the transaction except to sign the contract of purchase. Mr. Crittenden and Mr. Malley took control of the enterprise from the start. The inference is clear that they saw an opportunity to realize substantial profits with very little investment on their part. This inference is borne out by the fact that, on November 10, 1923, Mr. Crittenden and Mr. Malley entered into a written agreement which contains the following recitals: "Whereas, the parties hereto have been expending their time and abilities since January 27, in assisting John A. Hetzler to purchase the Moerlbach Brewing Company property of Rochester, New York, from the Union Trust Company, of Rochester, New York, and Whereas, said John A. Hetzler has abandoned said contract and desires to avoid any liability in regard to the same, if possible,

and has sold, transferred and assigned all his right, title and interest in said contract for such purchase of the Moerlbach Brewing Company property to said Henry L. Crittenden to be managed and disposed of under the direction of Henry L. Crittenden, and Whereas, the parties hereto have been responsible for all progress in regard to said contract and are devoting their energies and abilities to conclude the same successfully and the efforts of each were necessary to the other now." Further study of this document discloses the fact that Mr. Crittenden agreed to advance $20,000 for the temporary financing of a proposed corporation to handle the project of installing and operating a cold storage and ice business in the old brewery plant and to secure the payment of this $20,000 Mr. Crittenden was to have title to the bottling plant and two acres of land adjoining. He was also to have as additional security for this $20,000 loan the entire capital stock of the company to be formed save the shares which were to be issued to Bovanizer and Preston. The agreement further shows that Mr. Crittenden had acquired Hetzler's interest in the property on some kind of a stock adjustment basis which indicates that Mr. Crittenden was indebted to Mr. Hetzler instead of Mr. Hetzler being indebted to him. The $20,000 mentioned in this agreement was advanced by Mr. Crittenden from moneys borrowed from his father-in-law which loan was secured by a policy of insurance on Mr. Crittenden's life. Mr. Crittenden testified that he determined in December, 1923, to loan his wards' funds to Hetzler and it was then that Hetzler agreed to give him a mortgage, as security for the loan, on lots 2 and 3 and that the trust company approved of the proposition and agreed its purchase-money mortgage would be limited to lot 1. The agreement of November 10, 1923, is in conflict with this contention.

On June 2, 1928, Mr. Malley sued Mr. Crittenden for an accounting under the agreement of November 10, 1923. Mr. Crittenden served an answer in that action admitting that a partnership and joint venture existed between him and Malley. Mr. Crittenden testified at length in the trial of that cause. He took the position that lots 2 and 3 were his personally and the court so found. He did not claim on that trial that he had loaned the moneys of his wards to Hetzler and that his deed to lots 2 and 3 was in fact a mortgage to secure the loan. Mr. Crittenden procured a deficiency judgment against Mr. Malley for approximately $8,881.76. This judgment was docketed December 3, 1929. Later Mr. Crittenden gave the incompetents credit for this judgment which eventually proved to be worthless.

The evidence compels us to find that Mr. Crittenden withdrew from the estates of his wards $44,679.87 as charged and converted it to his own use in promoting an enterprise in which he was personally and vitally interested. The learned official referee, to whom this matter was referred, has filed a report wherein he finds that all of the charges lodged by the Rochester Bar Association against Mr. Crittenden have been established. The evidence justifies the conclusions reported by him and his report should be confirmed. The referee makes no recommendation as to punishment.

We are asked by his learned counsel, in event the charges are sustained, to limit the punishment to a reprimand, for the reason Mr. Crittenden was a young and inexperienced attorney when the transgressions occurred, that full restitution has been made of the moneys converted, that his reputation in the community is of the best and that he was exonerated of intentional wrong-doing by stipulation of the interested parties made with consent and approval of the court on the judicial settlement of his committee accounts. We have given careful consideration to all these elements and to every shred of evidence in the record before us. He was young, only six years at the bar, when Malley and Hetzler interested him in this unfortunate venture. He sought, however, no counsel from judge or lawyer as to the wisdom of the course he was pursuing. He did not inform the trust company or his associates of the fact that he was using trust funds in the enterprise. He misled the court and the Veterans administration by inserting in his annual accounts a false statement that the moneys withdrawn had been invested in bond and mortgage and he procured the countersignature of the bonding company on the representation that he was investing the moneys withdrawn in bond and mortgage on the Moerlbach Brewing Company property, which representation he knew to be untrue. He claims he examined the authorities and the statutes before he decided to make the loan from his wards' estates to Hetzler, particularly *Matter of Union Trust Co. (Hoffman Estate)* (219 N. Y. 514). This case holds that a declaration of trust should be made whenever different trust funds are combined in a single investment and notice thereof must be given to the beneficiaries of the trusts. Mr. Crittenden filed no declaration of trust and gave no notice to the court or to the Veterans Bureau that he had made such an investment. The fact that the interested parties stipulated, in order to make a settlement, that Mr. Crittenden's motives were honorable is no defense. The stipulation of the parties and the consent of the court were not given for the purpose of condoning the conversion but to protect

the estates of these helpless veterans. The conversion survived the settlement. (*Matter of Randel*, 158 N. Y. 216, 219.)

The position taken by Mr. Crittenden in this proceeding is opposed to the established facts. Such a situation makes it impossible for us to exercise leniency. (*Matter of Ropiecki*, 246 App. Div. 80, 86.) On the record before us, nothing less than disbarment of Mr. Crittenden would serve the ends of justice.

Mr. Henry L. Crittenden should be disbarred and his name should be stricken from the roll of attorneys of the State of New York.

All concur, except TAYLOR, J., who concurs in the confirmation of the referee's report but votes for an order suspending respondent until the further order of the court. Present — SEARS, P. J., CROSBY, LEWIS, TAYLOR and DOWLING, JJ.

Motion for stay denied. Motion for leave to appeal to the Court of Appeals granted.

Report of referee confirmed and order of disbarment entered.