In the Matter of GEORGE E. PHILLIES and JAMES T. SANDORO, Attorneys, Respondents. BAR ASSOCIATION OF ERIE COUNTY, Petitioner.

Fourth Department, September 6, 1962.

94

*Hugh McM. Russ* for petitioner.

*James O. Moore, Jr.*, for respondents.

*Per Curiam.* We find in the record in this proceeding, contrary to the report of the Official Referee, ample evidence to sustain certain of the allegations of the petition. It is alleged therein (par. 18) that respondents entered into a conspiracy with one Floyd Barnes, then Chief of Police of the Town of Hamburg for the solicitation of personal injury and property damage accident cases by Barnes and the referral thereof to respondents.

Prior to 1952 the Police Department of the town had a form for use by members of the department in reporting accident cases. These completed reports were available for inspection by the public. In 1952 Barnes inaugurated a dual system of accident reports. One was denominated an accident report and the second an officer's report. The latter contained the vital information for future use by litigants or their attorneys including the versions of the accident as given to the reporting officer by those involved, the names and addresses of witnesses and their position at the time of the accident. The latter reports were delivered to Barnes by the investigating officer and Barnes kept them under lock and key available for use only by himself and the reporting officer.

The use to which these private reports were put and evidence of the close working arrangement between Barnes and respondents are established by the testimony of a member of the Erie County Bar. In late 1957 or early 1958 he was preparing a negligence case for trial. His investigator was having trouble getting any information from the police of the Town of Hamburg. The attorney called respondent, Sandoro, and requested the latter to call Barnes and request his co-operation. Sandoro replied that he would see what could be done. Subsequently, the attorney received the required information. It is significant that this conversation was not denied by Sandoro and we find the testimony of the investigator does not challenge the direct testimony of the attorney called by petitioner.

In about the year 1952 Barnes had a telephone with an unlisted number installed in his home and issued instructions to certain members of the department that he was to be called day or night whenever there was a serious accident. Barnes took little or no part in the actual investigations but invariably went to the hospital when there were personal injuries or fatalities.

There is evidence that both respondents had known Barnes for years. Respondent, Sandoro, had done legal work for Barnes and the two had visited at each other's homes. The close relationship between Barnes and Sandoro is shown by certain happenings at the time the State Commission of Investigation in 1959 was conducting an investigation of the conduct of Barnes. These hearings were brought to an abrupt conclusion in May, 1959 when Barnes resigned as Chief of Police. During these hearings Barnes testified on several occasions. Upon his last appearance he stated that he had talked with Sandoro several times although Barnes was represented by other counsel. Upon cross-examination in this proceeding Sandoro admitted the several meetings with Barnes during the investigation of the commission. His explanation for the conferences was that he knew " the reputation of Phillies & Sandoro was at stake " and " that is what I was trying to protect and defend." In the absence of any collusive arrangement between respondents and Barnes it is difficult to understand what fears respondents might entertain because of the investigation of Barnes. The last meeting between Sandoro and Barnes was the night before the latter resigned and brought to an end the investigation of the commission.

There is a wealth of proof of direct solicitation by Barnes on behalf of respondents. Thus, Arthur Hudson testified that he was struck by an automobile on June 2, 1953 in the Town of Hamburg. Mrs. Hudson was interviewed by Barnes who inquired if the Hudsons had an attorney. Upon receiving a negative reply he suggested the names of respondents and told her that " they had yet to lose a case ". Barnes later called to see Mrs. Hudson at her home and they went to the hospital where Mr. Hudson authorized the retention of respondents. Subsequently Mrs. Hudson went to the office of respondents and Sandoro told her that he knew that Barnes had made the appointment for her. He further told her that Barnes had "recommended quite a few people there and none of them [had] ever complained." Thereafter some person from the office of respondents called at the hospital and Mr. Hudson signed a retainer. The case was subsequently settled for $4,100.

One Robert Kay testified that he was struck by a bus on April 4, 1952. Barnes was at the scene of the accident and followed the ambulance to the hospital. After ascertaining that Kay had no lawyer Barnes told him that he had a good case and Barnes could get him a good lawyer. Later in the day respondent, Sandoro, came to the hospital and interviewed Kay, who was in a

semiprivate room. In response to an inquiry by Kay respondent said that he was the lawyer Barnes had sent. Kay testified that the conversation was conducted in low tones. Before Sandoro left he wrote on a slip of paper " Stay here as long as possible " and gave it to Kay. The paper was received in evidence. One Partridge, the other patient in the room, testified that some person visited the room and conversed in a low tone with Kay. After the person departed Kay showed him the slip of paper. Mrs. Kay testified that she was in the room when Sandoro wrote on the paper and gave it to her husband.

In the face of this strong testimony the version thereof given by Sandoro is unbelievable. He testified that Mrs. Kay came to his office and said she had heard " about us " from " some one " in Hamburg. A retainer was prepared and Mrs. Kay then said her husband was irritable and wanted to leave the hospital. " To appease her " Sandoro, according to his version, wrote on a paper " Stay in the hospital " and gave it to Mrs. Kay. Sandoro denied that he visited the hospital to see Kay. Upon cross-examination his attention was directed to the fact that the exhibit stated " Stay here as long as possible " and not " Stay in the hospital as long as possible." He was asked for an explanation. His reply — " I can't. I just wrote it out fast and that is it."

We find clear and convincing proof of overt acts on the part of Barnes and respondents that establish by a preponderance of the evidence the allegations of paragraph 18 of the petition. This same proof establishes the allegations of paragraph 19 of the petition as to the respondent, Sandoro.

There is also to be found in the record other substantial evidence which establishes to our satisfaction that Barnes solicited and referred or attempted to refer other negligence cases to respondents with their knowledge and consent as alleged in paragraph 31 of the petition. To keep this opinion within reasonable length this evidence will not be detailed but we refer to the testimony of the witnesses John Bahun, Elizabeth Scazafavo, Rose Zak, Richard Schoepperle, Andrew Dursky, Steve Dursky, Anna Anderson, Harold Anderson, Warren Herendeen, Ester McDonald, Mary Pye, Edward Fiutko, Kathleen Jones, Donald R. Jones and Samuel Cureo. It is significant that in all of these solicitation cases respondents either offered no proof to rebut that of petitioner or the testimony of respondents as to how the cases came to them is so vague and indefinite as to be unbelievable.

We also conclude that petitioner established by a preponderance of the evidence the allegations of the petition that respondents made direct attempts to induce other police officers to solicit negligence cases for respondents and offered to pay or split fees for said referrals. We briefly specify the proof. Richard Englund and Stanley Maronski testified that in 1958 they were police officers in the Town of Evans. In the late Winter or early Spring of that year respondent, Phillies, was interviewing the pair at Maronski's home in regard to their testimony at an approaching trial. Phillies there told them that they could " make a nice buck " by referring negligence cases to respondents; that Barnes " made himself a nice buck on it " and " we could too  *  *  *  if we would refer accident cases to [his] firm." Phillies showed them a newspaper account of a case recently settled by his firm for $35,000. About a week later both respondents returned to Maronski's home and in a further interview informed Maronski that they would pay him 5% of the amount recovered in any case referred to them by the witness.

We are unable to agree with the conclusion of the Referee that these two witnesses were unworthy of belief. Perhaps a few words should here be written about the testimony of petitioner's witnesses. Much of the proof was first unearthed in 1959 by investigators for the State Investigation Commission. Statements were obtained by these investigators. Many of the witnesses thereafter testified before the commission. After the present proceeding was commenced respondents rightly or wrongly had their investigators interview many of petitioner's prospective witnesses and obtain from them signed but unsworn statements. In this connection it was said in *Matter of Murphy* (254 App. Div. 770) that " When an investigation is ordered by the court it is indiscreet for an attorney to send for prospective witnesses and interview them. It lays him open to the suspicion that he may be attempting to thwart the investigation.  *  *  * The investigation was being conducted in secret by order of this court. Respondent could not have known that charges were to be preferred against him. By his conduct he invaded the secrecy of the investigation, and for that he is hereby censured."

It is apparent from reading the record that most of petitioner's witnesses were tense and at times unwilling witnesses. They had been subjected to much interrogation, if not pressure. A happening during the direct examination of the witness Stanley Maronski, whose testimony is referred to in a preceding para-

graph, illustrates graphically the point we are making. The Referee interrupted the direct examination and addressed the following remarks to respondent, Phillies: "Maybe if you stepped out for a minute, or sat somewhere else instead of staring at him, Mr. Phillies, in that manner, he might remember. Sit over there somewhere."

Dean Salisbury, Chief of Police of the Village of Blasdell, which is in the the Town of Hamburg, testified that he visited the office of respondents as a prospective witness at the trial of a negligence case and met both Phillies and Sandoro. The latter told Salisbury that if he would refer cases to respondents Sandoro "would make it worth [his] while". Subsequently Salisbury discussed the subject with Barnes and the latter told him that he was "missing the boat in not referring cases." Sandoro, as a witness, was content to deny without elaboration that he had ever asked Salisbury to refer accident cases to him. We believe the testimony of Salisbury.

Inasmuch as we are disaffirming the findings of the Official Referee we state our reasons therefor. Grievous error was committed by the Referee in this adversary proceeding in gathering independent proof unknown to any of the parties and basing his decision in part thereon. Thus, as heretofore stated, one of the crucial issues upon the conspiracy charge was the action of Barnes in inaugurating in 1952 a new system of dual accident reports whereby important information relating to accidents was channeled to him and was not available to others without his permission. The hearings herein ended in May, 1961. Some months later the Referee on his initiative communicated with the Police Commissioner of the City of New York " asking how such matters were handled in the city of New York." In reply the Referee received a letter of three pages containing a detailed account of how accident reports were kept in that city. Transmitted therewith were several forms used in that department. This letter and the forms are annexed to the report of the Referee as exhibits 1 to 7, inclusive. This was done, as stated, without the knowledge of any of the parties or their attorneys. Counsel for respondents has frankly conceded that such proof should be stricken from the record or ignored by us.

All of this resulted in the Referee finding that in inaugurating the new system Barnes " was a forward looking police chief " and " I say that because I sent a letter to the Police Commissioner of the city of New York ". It is plain that this issue was decided by evidence outside of the record of which the parties

or their attorneys had no knowledge until the decision was received.

Again at another point a question arose as to whether or not Barnes was a member of the State Retirement System. The issue was not resolved by proof but apparently after the conclusion of the hearings the Referee "with that doubt in mind * * * wrote to the New York State Employees' Retirement System and found that Barnes was in the Pension System and that his contributions were returned to him on the 4th day of June, 1959. He had joined the system on August 16, 1947."

We are unable to determine the precise weight the Referee accorded this proof improperly gathered and used as a basis for deciding at least one of the crucial issues of the proceeding and upon which were founded the issue of solicitation by Barnes and referral of cases to respondents. One can only conclude from a reading and rereading of the report that the material obtained from the New York City Police Department carried great weight in the deliberations of the Referee. We conclude that these acts done obviously with the best intentions prevented an unbiased evaluation of the proof properly received in accordance with the recognized rules for the conduct of a disciplinary proceeding which is, of course, an adversary one.

Furthermore, the Referee at the conclusion of the hearings summoned the District Attorney of Erie County before him and had the latter sworn as a witness. Therefrom, together with other evidence, the Referee found the Statute of Limitations for the prosecution of Barnes for the crimes of conspiracy and violations of sections 270-a, 270-c, 270-d and 276 of the Penal Law "has not yet run as to any of the crimes." The Referee went on to point out that the Commission on Investigation "could not and did not find that Barnes or Phillies or Sandoro had committed any crime" and concluded that "This whole effort to involve Barnes and Phillies and Sandoro before me came to naught."

We believe that all of this misses the issues presented. "A disciplinary proceeding is in no sense a criminal one, and the statutory rules relating to the presumption of innocence and the burden of establishing the respondent's guilt beyond a reasonable doubt do not apply. (*Matter of Randel,* 158 N. Y. 216; *Matter of Spenser,* 143 App. Div. 229, 236; affd., 203 N. Y. 613.) " (*Matter of Ropiecki,* 246 App. Div. 80, 81.) Whether Barnes or respondents were guilty of the commission of crimes was not an issue. Barnes was a stranger to the proceeding and respondents were charged only with professional misconduct. While certain paragraphs of the petition allege violations of certain

stated penal statutes along with rules of this court and canons of professional ethics the degree of proof and other rules applicable in a criminal action had no pertinency in this proceeding. "There is no Statute of Limitations which prevents the court from taking cognizance of unprofessional conduct on the part of attorneys." (*Matter of Simpkins*, 169 App. Div. 632, 635.)

Again, however, a careful consideration of the report leads irresistibly to the conclusion that this apparent misapprehension on the part of the Referee blurred his vision and lead to an erroneous conclusion on this most important issue in the proceeding. This conclusion is fortified by lengthy study of the report. Here and there throughout the document of 395 pages express findings are made that the Referee disbelieves the testimony of a stated witness. But as to the vast majority of the 42 witnesses called by petitioner the Referee is content to recite in summary form the substance of their testimony and then in effect disregards it. Finally, we cannot agree with the apparent conclusion of the Referee that the enmity of the former police officer, Hassett, towards Barnes causes all of the substantial evidence in this record to evaporate. That enmity may have triggered the investigations but it does not lessen the weight of the testimony of the many disinterested witnesses found in the record.

In passing, although this issue is not stressed by petitioner, we must call attention to the unrevealing and most unusual set of books maintained by respondents. Both of them in their testimony claimed lack of knowledge of their accounting and bookkeeping methods during the years under consideration. Phillies testified that the bookkeeping system was set up in the late 1930s or early 1940s but he had "nothing [to do with the bookkeeping] at any time" because he was "very poor in mathematics" and "let somebody else do the bookkeeping." Sandoro testified he had "become acquainted with [the books] recently, within the last two or three years." Apparently this was about the time the State Investigation Commission commenced its activities.

The complete inadequacy of the books is illustrated by one bit of testimony. The employee of respondents, who had kept the books since 1945, testified that prior to 1957 so-called investigation or pretrial expenses were entered in a lump sum without itemization on various ledger sheets of clients. At the time of an audit in 1957 by the Internal Revenue Bureau respondents were informed that such charges in excess of $100 would be disallowed unless itemized. Thereupon the bookkeeper was compelled to charge back to respondents as income the amounts

that had been set up as "investigation expense" without substantiation.

The testimony of petitioner's accountant relating to the books and records of respondents covers nearly 350 pages in the record. The Referee found the allegations of the petition relating to these records not proven and, as heretofore stated, petitioner does not take serious issue with that finding. The failure of proof in large part can be attributed to the success of respondents in maintaining a set of books that apparently a certified public accountant could not penetrate because of the lack of information therein. Moreover, it is admitted by respondents that many financial transactions relating to legal business in the office never were entered in the books.

We emphasize that our ultimate findings of professional misconduct are not based on this portion of the case but the studied indifference of both respondents — if their testimony is believed — of the inadequate, if not dishonest, manner in which the books were being maintained for more than a decade is revealing proof of their complete disregard, or lack of understanding, of the standard of conduct required of an attorney. The duty of a lawyer with respect to financial records is stated in *Matter of O'Neill* (228 App. Div. 518, 520) as follows: "The purpose of keeping proper books of account, vouchers, receipts and checks is to be prepared to make proof of the honesty and fair dealing of attorneys when their actions are called in question, whether in litigation with their clients or in disciplinary proceedings and it is a part of the duty which accompanies the relation of attorney and client. The failure to keep proper books, or the destruction of books, vouchers and checks, is in itself a suspicious circumstance." And it was recently written in *Matter of Neimark* (13 A D 2d 676, 677) that " while an attorney may not be disciplined for his employees' neglect which he did not authorize and of which he had no knowledge (*Matter of Wilson,* 181 App. Div. 944, 170 N. Y. S. 725, 729), he may and should be disciplined for his own carelessness and failure to supervise adequately the operations of his office."

Finally, in the light of certain statements in the report of the Referee, we find that the attorneys for the respective parties acted with honor and in accordance with high standards of professional integrity in the trial of this proceeding.

That portion of the report that finds that the charges herein discussed have not been sustained and should be dismissed, is disapproved. We find the respondents guilty of professional misconduct as herein more fully stated.

This proof establishes that over a period of years respondents worked hand in hand with Barnes in chasing negligence cases. Respondents attempted to corrupt other police officers and attempted to persuade them to solicit cases. When the Commission on Investigation was closing in on Barnes the respondent Sandoro was his frequent conferee because in the words of the latter "we were the stepping stones to Chief Barnes. * * * The Commission would not be investigating, couldn't get to Barnes unless they could connect him up with some legal firm as they were doing".

The proof demonstrates the unfitness of respondents to continue as members of the legal profession. They should be disbarred.

Williams, P. J., Bastow, Goldman, McClusky and Henry, JJ., concur.

Report of Official Referee disapproved and certain charges of professional misconduct sustained in accordance with the opinion and order of disbarment entered.