The People *ex rel.* Charles S. Deneen, State's Attorney,

*v.*

Webb P. Matthews.

*Opinion filed October 24, 1905.*

1. Disbarment—*evidence must be clear to warrant disbarment.* In order to warrant the disbarment of an attorney the truth of the charge contained in the information must be established by clear and satisfactory evidence.

2. Same—*charges against attorney must be specific.* Under the statute and the rules of the Supreme Court the charges against an attorney in an information for disbarment must be clear and specific, giving time and place and the acts of misconduct with reasonable certainty.

3. Same—*an attorny can only be tried on the charges alleged.* On information for disbarment an attorney can be tried only on the charges contained in the information, and proof of other acts of misconduct not charged in the information will not justify his disbarment where the charges alleged are not satisfactorily proved.

Original information for disbarment.

Chas. S. Deneen, State's Attorney, (Ben M. Smith, and John L. Fogle, of counsel,) for the relator.

E. M. Ashcraft, Jr., (E. M. Ashcraft, of counsel,) for respondent.

Per Curiam: This is an original proceeding by which it is sought to have the name of Webb P. Matthews, an attorney of this bar, stricken from the roll. The information

charges two offenses which the evidence tends to prove: First, that respondent colluded with one Mary Manupelli, a married woman, for the purpose of practicing a fraud upon the courts of Cook county by representing to them that she had, in the month of September, 1903, been a resident of this State for one whole year next preceding that time, the fact being that she had only been a resident of the State since April, 1903; second, that during the months of June, July and August, 1903, he falsely and fraudulently pretended to her that he had filed a bill for divorce for her against her husband in some one of the courts of Cook county, when in fact such a bill had not been filed by him.

According to the testimony of Mary Manupelli, she called at the office of the respondent in June, 1903. He was then employed by the Spencer Collection Agency, and officed in one of the suite of rooms occupied by that organization in the city of Chicago. She went there in response to an advertisement, questionable in character, inserted in a daily newspaper in the city of Chicago by the Spencer Agency. She there had a conversation with respondent in which she told him that she had been married in 1897, and, in substance, that her husband had deserted her more than two years prior to that time and had since persisted in such desertion; that she had been living in one of the New England States until in April, 1903, when she came to Chicago, where she resided with her mother, who had moved to Chicago from the east in September, 1902. He informed her that she could not obtain a divorce in this State until she had been here thirteen months, but suggested to her that as her mother had come in September preceding, "perhaps I could make it from September, as though you came here from September," and advised her that on that basis he could obtain a divorce for her in September of that year, 1903. Thereupon negotiations were had between them in regard to the expense of obtaining a divorce, and he agreed with her that for the sum of $38, to be paid to him by her, he would obtain a divorce

for her and pay the costs of the proceeding. Of this sum
$15 was to be paid at once and was to be used to pay the fee
of the printer for publishing the notice, and the remainder
was to be paid on the morning the case was called for trial
in court. A few days after that the $15 was paid and Mrs.
Manupelli signed a bill for divorce which the respondent
had prepared, which was not entitled as of any term of court
and in which it was represented that she had been an actual
resident of the State of Illinois for more than a year preced-
ing the filing of the bill. To this an affidavit of the truth-
fulness of the statements contained in the bill was attached,
which she also signed, but no oath was administered. This
bill never was filed. She advised Matthews that her mother
had always been very much dissatisfied with her marriage
and was exceedingly anxious that she should obtain a di-
vorce, and that for the purpose of satisfying her mother that
the suit was pending she desired a copy of the advertisement,
by which she designated the notice to a non-resident defend-
ant which it was necessary to publish in the case; and she
further says: "I did tell him that I wanted to tell them at
home that I had brought suit so they would know that I was
really anxious to get a divorce;" and Matthews told her
that he would institute the suit at once and send her a copy
of the advertisement; that the case would come up in Sep-
tember, and that she would not need to come to the office
again for three months. Mary Manupelli had no money or
property and obtained this $15 from her mother. Shortly
afterwards, before the expiration of the three months, not
having received a copy of the publication notice, she called
at his office and asked him to let her have "the advertise-
ment," and told him that the reason she wanted it was that
they would not believe at home that she had given him the
$15 and instituted the suit. He assured her that the notice
had been published, and directed her to go to the office of
the *Law Bulletin* to obtain it. She went there but was un-
able to find the notice. On the 30th of September he wrote

her a letter asking her to call and see him with reference to her divorce case. She went to the office and he then asked her for the balance of the $38. She told him that the money was not to be paid until the morning of the trial and that her family wouldn't let her have the money because she had not received the paper containing the advertisement. He again assured her, "It is all right, it has been advertised." She left the office without making any definite arrangement about the payment of the balance.

It also appears from the testimony of this witness and from that of Nathan E. Kemmelhor, who is described as her second cousin and a married man, that they together went to the office of Matthews in July or August. Kemmelhor had been acquainted with Mrs. Manupelli's husband and had known them both in the east. When they reached the office Kemmelhor asked when "the divorce would take place," and was told by Matthews that it was liable to be in a week or ten days. Kemmelhor suggested he would attend the trial if he could be of any use as a witness, and said he was familiar with the circumstances, and Matthews told him he would let him know in a week or two when he should appear.

It is shown by the testimony of Kemmelhor alone that on this occasion he spoke privately to Matthews and asked him how about the thirteen months that the complainant had to be here before she could apply for a divorce. Matthews answered that he had it all arranged, and said, "You leave it all to me." Kemmelhor desired to talk to him in reference to what his testimony would be, and Matthews responded, "When the time will come we will find out what will be the best." Kemmelhor also inquired whether he had sufficient proof, and Matthews replied, "Yes, I have got a whole bunch of it." Kemmelhor and Mrs. Manupelli went together on three or four different occasions to see Matthews in regard to this suit and were assured on each occasion it was pending. About three weeks after the occasion on which Kemmelhor had been told that he would be notified in a

217—7

week or ten days, he testifies that he called at Matthews' office alone and inquired why he had not received notice. Matthews replied, "Well, I am expecting it every day." Kemmelhor asked what the number of the case was, and upon respondent's failing to give the number, Kemmelhor inquired whether the suit had been entered. Respondent told him that it had been commenced in the circuit court. Kemmelhor left and went to the circuit court, as he expresses it, and was unable to find any trace of the case, and then went "to the superior court" and made search with like result. He then, on the succeeding day, called on Matthews and told him that he had been to the circuit court and could not find the case. Matthews then said, "Well, it is in the superior court." Kemmelhor replied that he had looked in both courts and could not find it in either. Matthews responded that he had advertised the case in the *Chicago Legal News* the last two weeks of July or the first two weeks in August. Kemmelhor called at the office of that newspaper, and was advised there that no such publication had been made in its columns. Thereupon, a day or two later, he again called at Matthews' office and demanded of the latter the $15 that had been paid to him and some papers connected with the matter that had been left with him by Mrs. Manupelli. Matthews declined to surrender the papers or refund the $15, but a few days later mailed the papers to his client, and still retained the money. Kemmelhor then advised her to make complaint to the Chicago Bar Association. When she did so, she made a statement, substantially as hereinabove set out, to the relators in this cause, who composed a committee known as the grievance committee of that association. Thereupon this proceeding was instituted by them.

Respondent learning that the information herein had been filed called upon Mrs. Manupelli, at the place of business of Charles Scribner's Sons in Chicago, where she was employed. According to the testimony of both, he asked her why she had made the complaint to the grievance commit-

tee. She replied, because she wanted her $15 back. He said that if she had called at the office he would have given her the money back. After some further discussion he gave her $30 in two payments, $15 of which was the money she had already paid him, and as to the purpose for which the other $15 was paid, he and she differ. She expressed regret that a suit fraught with unpleasant consequences for Matthews had been begun, and he tried to induce her to go again before the grievance committee and state that the complaints she had made were untrue. She expressed a willingness, as she now says, to make such statement provided she would not become involved in trouble herself, and swears that the second $15 was to pay her expenses to Milwaukee, where she was to see Kemmelhor and endeavor to induce him to keep away from Chicago so that his testimony could not be taken in this proceeding; while respondent testifies that she utterly refused to go before the committee again, but said that Kemmelhor was in St. Louis and that if Matthews would give her Kemmelhor's car fare she would send it to him and have him come to Chicago and go before relators and tell them to abandon the matter. Shortly after this payment was made, and on March 9, 1904, someone telephoned to her and said, "Mr. Fogle [a member of the grievance committee] wants to see you." She responded, "Please drop this case." He directed her to appear again before the grievance committee. She did so. When she reached the committee room, Fogle, Whitman and O'Connell, three members of the grievance committee, and Matthews were there. The latter remained while she made her statement. She at this time assured these members of the grievance committee that when she called on Matthews in the first instance, she told him that she came to Chicago in September, 1902, and that she never made any different statement to him until the time at which he paid her back the $15. On this occasion, however, she adhered to her original statement to the effect that Matthews told her that the suit had been brought, a notice

published and that the case would be reached in September. She also assured the committee that she had purposely deceived them on the occasion of making the first statement for the purpose of getting her $15 back, and testified in this case that she did not know the proceeding she set in motion might have such serious results for Mr. Matthews, but that she supposed the association would compel him to refund the $15 and that would be the end of the matter. While she was making the second statement to the committee, and while Matthews was still present, she was asked, "How much money has Mr. Matthews paid you?" and answered, "Only $15," and says she made this answer because Matthews had warned her not to tell the committee about the payment of the remaining $15.

While she was testifying in this case in reference to this latter $15, the following colloquy occurred on cross-examination:

Q. "Were you paid for coming up here to-day?

A. "Paid for coming up here?

Q. "Yes.

A. "By whom?

Q. "Didn't you get fees for coming up?

A. "Fees?

Q. "Yes.

A. "From whom?

Q. "From anybody.

A. "No, sir.

Q. "Nobody paid you or promised you anything?

A. "No, sir. I begged before the association to please drop this matter.

Q. "I am not asking you anything now. You have been talking enough and fast enough. Madam, when nobody is asking you anything, it might be well if you would keep still, I think.

A. "To whom will I pay the $15 I have taken from Mr. Matthews?

Mr. Fogle: "I have nothing to do with that matter, Mrs. Manupelli.

The witness: "To show you gentlemen that I am sorry, and that I would have gone out of town to-day, and I would have done so if I could—

Mr. Ashcraft: "She is not on the witness stand now, Mr. Reporter.

Mr. Fogle: "Certainly she is. You said you wanted everything that occurred.

The witness: "I was willing to go out of town, but, gentlemen, I cannot help it now. (The witness at this point offered $15 in currency to respondent, Matthews.) Now, Mr. Matthews, I don't want it, and I hope you will keep it. I have told the truth now, for lies kind of get me in trouble. I got it from Mr. Matthews, and I will give it back to Mr. Matthews.

Mr. Ashcraft: "Let's see how much there is.

The witness: "There is five, ten, fifteen. (Counting money.) I would have gone out of town if I could, but I have come up here now to hand this to you.

Mr. Ashcraft: "She returns the $15, which is accepted by Mr. Ashcraft and put away.

The witness: "Just to show you gentlemen that I would have gone out of town."

Respondent testified that when Mrs. Manupelli first called on him, she told him that she had been in Chicago since September, 1902; that he advised her that her bill could not be filed until she had been an actual resident of the State for one year, and that she explained to him that her relatives were bothering her and tantalizing her and quarreling with her because she, a Jewess, had married a man who was an Italian and a catholic, and that she would have no peace with them until she could get a divorce, and that she said to him: "Can't you do something for me so that I can tell my parents that I have made application and that I intend to get a divorce?" and that he assured her that he sympathized

with her, and would draw a bill for her if she would pay him $15 for that service, and that she could sign it and tell her mother that the proceeding was under way and refer the mother to him, and that in accordance with this arrangement the bill was drawn and signed and the $15 paid. He admits that he made the statements to Kemmelhor which that gentleman avers were made to him, but testifies that he made them in the interest of his client and for the purpose of conveying to Kemmelhor the impression which he understood she desired her relatives to have, viz., that a suit was pending; and swears that he did not in fact agree or intend to file the bill until the expiration of a year from September 1, 1902. He is corroborated to some extent by Henry J. Kramer, president of the Spencer Collection Agency, who testifies that he was present during Mrs. Manupelli's first conversation with Matthews, and that she stated that she had been in Illinois eight or nine months, and that Matthews told her that she could not apply for a divorce until she had been here a year; also by Charles J. Kramer, secretary and treasurer of the collection agency, who swears that he was at the place of business of Charles Scribner's Sons in February, 1904, at the time of the first interview between Matthews and Mrs. Manupelli after the filing of the information; that at that time he heard Matthews say: "I am sorry you got me into trouble; you know you have not told the truth;" and that she replied, "I am sorry I ever did it; I don't want to put you to any trouble; I don't want to prosecute the matter; all I want is my money back;" and that she further said that she had told the grievance committee some things that were not true, and that she was ready to go over there and make a clean breast of it and get out of it as best she could, but did not want to do anything unless Mr. Kemmelhor would come back and arrange the matter, and that if his expenses, which would be about $15, were paid, she would bring him back. Respondent is further corroborated by Margaret E. Sutton, an employee in the office of the Spencer Collection

Agency, who testifies that in the latter part of August or the first of September, 1903, she heard a part of a conversation between Matthews and Mrs. Manupelli in which he said, "Well, when you pay the balance of the money I will start your suit, and I won't start it before;" that some time about a week later Mrs. Manupelli was again at the office and inquired when the bill would be filed, and respondent again told her that he would not file the bill until he received the balance of the money, which tends to show that she knew despite the assurances given Kemmelhor in her presence that the suit had not been instituted. To some extent the evidence of the witness Sutton loses its force, however, from the fact that on cross-examination she could not tell certainly whether Mrs. Manupelli inquired when the bill would be filed, or whether she inquired when the case would come up, and the witness then stated that Matthews might have replied that it would not come up or that it would not be tried until he got the balance of the money.

A careful consideration of the testimony leaves us unable to say that the charges set forth in the information filed against the respondent have been sustained by the character of proof required to justify the legal conclusion of guilt. The punishment to be inflicted by disbarment of an attorney is the destruction of his professional life. Only clear and satisfactory proof can justify a decision from which would flow consequences of such grave nature. In *People ex rel.* v. *Harvey*, 41 Ill. 277, we said that to justify the infliction of such heavy punishment as disbarment "the case must be clear and free from doubt, not only as to the act charged, but as to the motive." In *People ex rel.* v. *Barker*, 56 Ill. 299, wherein a judgment of disbarment was asked, it was said that the law undoubtedly requires "evidence of clear and positive character  *  *  *  to establish a charge so grave in its nature."

We find nothing in the record which will warrant us in attaching greater credence to the testimony of Mrs. Manu-

pelli than to that of the respondent. His testimony is corroborated to an extent equal to that of hers. That he is guilty of the charges specifically set forth in the information upon which he is being tried is not shown by evidence which is clear and positive and free from reasonable doubt. We regard his conduct in entering into an arrangement with her to deceive her parents and friends in reference to the pendency of the divorce proceeding, in paying her $30 in furtherance of a plan to get this case disposed of without a trial, and in suffering her to make an uncontradicted statement to the grievance committee in his presence to the effect that he had paid her but $15, as most reprehensible and unworthy any member of the honorable profession to which he belongs; but his disbarment is not sought on either of these grounds.

The General Assembly, by section 8 of chapter 13, (1 Starr & Cur. Stat. 1896, p. 492,) entitled "Attorneys," provided that before the name of an attorney should be stricken from the rolls he should be notified distinctly of the grounds of complaint or the charges exhibited against him, and should have notice and reasonable time in which to make his defense thereto. Rule 40 of this court provides that an information for the disbarment of an attorney shall make clear and specific charges, giving time, place and acts of misconduct with reasonable certainty. In *People ex rel.* v. *Allison,* 68 Ill. 151, we held, on an information against an attorney at law he can only be tried on the charges contained in the information.

The evidence being insufficient to legally establish the truth of the charges alleged against the respondent, the rule to show cause why he should not be disbarred must be discharged.                                          *Rule discharged.*