FOURNET, Justice.
 

 The Supreme Court Committee on Professional Ethics and Grievances, upon the complaint of the Alexandria Bar Association, instituted this proceeding against Lee J. Novo, an attorney of the Alexandria bar, seeking his disbarment on charges of professional and ethical misconduct.
 

 
 *838
 
 The action is predicated on the defendant’s alleged violation of his duty (1) toward the Rev. A. Cliff Searcy, Novo’s client in the matter of Searcy v. Interurban Transportation Company et al., 189 La. 183, 179 So. 75, because of his settlement with Searcy for an amount less than that agreed upon, as evidenced by his retention of a larger portion of the amount recovered in that case as his fee and also by his retention of the sum of $400 as purported expenses incurred during the prosecution of the case, which expenses, it is claimed, were to have been borne by Novo; (2) toward T. H. McGregor, Novo’s associate counsel in the case of Searcy v. Interurban Transportation Company et al., by his repudiation of the agreement between them with reference to the distribution of the fee in that case; (3) toward his client Miss Ollie Horner, by compelling her to file suit against him for the recovery of the property (or its value) caused by Novo to be adjudicated to himself at the time when a money judgment obtained by Novo for Miss Horner was sought to be satisfied by a foreclosure sale;' and (4) toward the Hon. R. C. Culpepper, one of the judges of the Ninth Judicial District Court.
 

 The defendant interposed an exception of no cause of action, which we overruled. 196 La. 1072, 200 So. 466. Subsequently, the evidence in the matter was taken before Philo Coco, the Commissioner appointed by this court to • receive the evidence in the case. In the report which the Commissioner has submitted to us, which is based on his findings of fact and his conclusions of law in the case, he states that in his opinion the evidence sustains the first, second, and fourth charges brought against Novo, recommending that the defendant be disciplined by this court for his professional misconduct in these respects. As to the third charge, he exonerates Novo.
 

 The defendant has excepted to the Commissioner’s report, contending (1) that he settled with the Rev. Searcy in full and according to their agreement after the termination of the Interurban Transportation Company case, pointing out that the cancelled check given by him to Searcy, the receipt signed by Searcy in full settlement, and his complete exoneration by a jury on a charge of embezzling this amount from his client sustain his contention in this respect; (2) that he was justified in refusing to divide his fee with McGregor, since McGregor after the Interurban Transportation Company case was lost the second time in the Court of Appeal for the Second Circuit, terminated his association with the case and turned over to him (Novo) his entire file in the matter, further, that even if he did owe McGregor a percentage of his fee in that case, his refusal to make a settlement of the same, under the circumstances of the case, could not form the basis of a cause for disbarment. He denies that he at any time either threatened or showed any disrespect toward Judge Culpepper of the Ninth Judicial District Court.
 

 Lee J. Novo, who has been practicing law in the' city of. Alexandria, Louisiana, Rapides Parish, since his admission to the bar in 1927, was employed in 1935 to bring suit against the Interurban Transportation
 
 *840
 
 Company, Inc., and the Tri-State Transit
 
 Company
 
 of Louisiana, Inc., by the Rev. A. Cliff Searcy, upon the recommendation of T. H. McGregor, also an attorney at law and former judge of the Court of Appeal for the Second Circuit. By the suit the Rev. Searcy sought to recover damages for his treatment while traveling on a bus of the Tri-State Transit Company from Colfax, Louisiana, to Alexandria, as well as for his treatment after his arrival in the latter city. (For particulars of the case, see Searcy v. Interurban Transp. Co., La.App., 171 So.
 
 468;
 
 Id., La.App., 179 So. 93; and Id., 189 La. 183, 179 So. 75.) At the time that Will D. Searcy, brother of the Rev. Searcy, accompanied by Raymond C. Parker, an attorney of Winnsboro, Louisiana, and friend of the Searcy family, called on McGregor, who was well known to the Searcys, with the view of securing his services in the prosecution of the suit, he was in the employ of the federal government and unable to take the case. However, he referred them to Novo, with whom he was favorably acquainted, and recommended him as the person to give the case’ every consideration, himself taking them to
 
 Novo’s office,
 
 which was in the same building in which McGregor worked. Novo consented to take the case on a contingent basis, he to receive 40% of any amount that might be recovered against the transportation companies. After the case had been lost in the lower court, Mc-Gregor, who had been granted a furlough from the government in the meantime, agreed to become associated with the case while it was on appeal, he to receive a fee of 12%% out of the amount recovered. After the case had been before the Court of Appeal for the Second Circuit on two different occasions, the judgment of the lower court was affirmed on June 30, 1937, Searcy v. Interurban Transp. Co., La.App., 179 So. 93, and a rehearing was denied on July 19, following. Novo then applied for and was granted a writ of certiorari by this court, in order
 
 that the
 
 judgment of the Court of Appeals might be reviewed. After due consideration, the judgments of both the district and appellate courts were reversed on January 10, 1938, Searcy v. Interurban Transp. Co., 189 La. 183, 179 So. 75, and the Rev. A. Cliff Searcy was granted a judgment against the Tri-State Transit Company of Louisiana, Inc., alone, in the amount of $3,500, which, with interest, amounted to $3,941.38 at thg time of the settlement. In addition to the Rev. A. Cliff Searcy, the check in settlement of the judgment was made out in the names of Lee J. Novo, S. R. Plolstein, and T. H. McGregor, at the request of McGregor. Novo refused to accept the check as thus made out and threatened to issue a writ of fi. fa. in order to collect the judgment; whereupon the Hon. Pike Hall, the attorney from Shreveport, Louisiana, representing the defendant in the mattér, deposited the full amount of the judgment, together with interest, wtih the Hon. U. T. Downs, the Sheriff'of Rapides Parish, for distribution. McGregor immediately wrote a letter to the sheriff calling to his attention the fact that he was one of the attorneys of record in the case, and, as such, entitled to an eighth of the amount held by him. He also called the sheriff’s attention to the fact that S. R. Holstein of Winns
 
 *842
 
 boro, Louisiana, had been an attorney of record in the case from its beginning. (It does not appear anywhere in the record that Holstein has ever at any time made claim for any portion of the amount collected from the transit company.) However, upon Novo’s presentation of a power of attorney from the Rev. Searcy and his agreement to indemnify the sheriff against any damage he might suffer as the result of his release of the money, the sheriff released the entire amount to Novo. On February 19, 1938, almost immediately after securing the money, Novo drove to his client’s home in Winnsboro and while there wrote out a check for $1,700.69, being the Rev. Searcy’s share of the proceeds of the judgment secured against the TriState Transit Company under an alleged subsequent agreement entered into between Novo and the Rev. Searcy at a time when Novo visited the Rev. Searcy in the hospital, this subsequent agreement modifying the former agreement entered into at the time W. D. Searcy and Raymond C. Parker called on Novo by increasing the amount to be received by Novo from 40% of the amount recovered to 50%, after the deduction of all expenses. This settlement was made in the presence of the Rev. Searcy’s mother and brother and Novo was given a receipt by the Rev. Searcy showing that the same was in “full and final settlement” of the suit brought by the Rev. Searcy against the Interurban Transportation Company et al. The following week Novo received a letter from S. R. Holstein demanding from him the amount of $780.-11, allegedly illegally retained by Novo in excess of the amount due him. This demand not being complied with, the Rev. Searcy instituted suit against Novo on March 5, 1938, for $1,000. Five days thereafter, on March 10, 1938, McGregor instituted suit against Novo and against Sheriff Downs on his own behalf, seeking to recover the sum of $492.67, his alleged share of the fee in the Searcy case. While these suits were pending in the lower court, embezzlement charges were preferred against Novo by the Rev. Searcy in the Parish of Franklin and proceedings to have him disbarred were instituted in Alexandria. He was exonerated of the embezzlement charges, but the two civil suits of Searcy and McGregor against him were prosecuted to a sticcessful conclusion, McGregor recovering the full amount claimed by him, the Rev. Searcy recovering a judgment of $664.14. Both of these judgments, together with costs, interest, etc. (amounting to $1,372.66 in all), were paid in full by Novo, leaving him (after deducting the $1,372.66, the sum of $1,700.-69 formerly paid the Rev. Searcy, and expenses amounting to $540) as his fee for recovering the judgment of $3,941.38 against the Tri-State Transit Company of Louisiana, Inc., the net sum of $328.03.
 

 This disbarment proceeding, as previously stated, was filed .upon the complaint of the Alexandria Bar Association. The record in support of the charges that have been made against Novo consists of a statement made by T. H. McGregor “To And At The Request Of The Alexandria Bar Association Grievance Committee” on May 11, 1938, wherein he gives .in detail his version of the history of the case; an affidavit filed with the same committee and
 
 *844
 
 signed by the Rev. A. Cliff Searcy, his mother, Mrs. I. W. Searcy, and his brother, W. D. Searcy, on March 19, 1938, in which their version of the transaction with Novo is given; statements of Judge R. C. Culpepper, Miss Ollie Horner, and two members of the Alexandria Bar Association, filed with the association; and the testimony of all of these parties, with the exception of Mrs. Searcy, who was out of the state at the time, taken before Philo Coco, the Commissioner appointed by this court to receive the evidence in this case, on October 3, 1941. In this same record is to be found, in addition to the testimony of Lee J. Novo, Judge Leven L. Plooe, and two doctors from the State Colony and Training School, all taken before the Commissioner, the records in the suits brought against Novo by the Rev. Searcy and by T. H. McGregor.
 

 The Commissioner before whom the testimony and evidence was taken, states in his report to us that “It is the finding of this Commissioner that in the suit of A. C. Searcy versus Interurban Transportation Company, which forms the gist or bulk of the complaint filed against defendant, - that an agreed attorney’s fee of 40% had been understood and settled upon; that while considerable work,
 
 possibly of an unanticipated
 
 nature, was involved in this case all that could have been charged as attorney’s fees by defendant was 40% of the total amount recovered. Defendant claims that he had a corrected arrangement with his client to increase the fee to 50% and that this arrangement was made with client while he was in the insane asylum at Pine-•ville. The client and his brother, Will Searcy, deny this and maintain there had been no pre-arranged or subsequent alteration of the original agreement to pay 40%.
 
 Whether this amended or altered contract of employment actually took place is of no moment as Novo’s client was then a patient in an insane asylum and in no place or condition to transact business especially if unaided or unassisted by disinterested advice.”
 
 (Italics ours.) He states further: “It is the finding of this Commissioner that Judge McGregor, through his efforts, had brought Novo into the case and had assisted him in its prosecution and was to receive 12%% of the total amount of the judgment as his fee, to be taken from that portion reserved by defendant in his contract of employment with A. C. Searcy. Your Commissioner finds further that defendant was unjustified in repudiating. this agreement and occasioning Judge T. H. McGregor the expense, time and inconvenience of having to file suit against defendant to recover his fee.” He concluded : “ * * * that Novo’s action and conduct in the charge first brought against him involving the Searcy and McGregor suits is one that calls for strict disciplinary action.”
 

 We think the Commissioner erred in his conclusion with respect to the mental condition of the Rev. Searcy. The fact.that this gentleman was placed in the institution at Pineville, Louisiana, which happens to be an insane asylum, for medical treatment, does not necessarily mean that he was insane. While it is true that he was and still is 'afflicted with certain physical incapacities as the result of the stroke he suf
 
 *846
 
 fered in 1934 while traveling on a bus of the Tri-State Transit Company, there is nothing in the record to indicate that he was ever mentally deranged. As a matter of fact, the record conclusively reflects that the opposite is true. When Novo was first contacted by the Rev. Searcy’s brother, W. D. Searcy, and Raymond C. Parker, the Winnsboro attorney and friend of the Searcy family, Novo refused to take the case until he had interviewed the Rev. Searcy. Th.e Rev. Searcy not only went to Alexandria to see Novo, but he was able to give him a detailed statement of all that had happened during his trip on the bus of the transit company and while in Alexandria, as well as testify when his suit against the transportation companies was tried. He testified at the criminal prosecution brought against Novo at his instigation; he testified at the trial of his case against Novo for the recovery of the amount claimed to have been illegally withheld by Novo in the settlement of the amount recovered against the transit company; he testified when the suit brought by McGregor against Novo for a percentage of the fees in the Interurban Transportation Company case was tried; and he testified before the Commissioner when the evidence in this case was taken on October 3, 1941. It is true that most of the correspondence and the minor details of the Reverend’s case against the transportation companies were handled by his brother in the very beginning, but it appears the Rev. Searcy later became dissatisfied with his brother’s actions, for, in a letter written by him (the Rev. Searcy) to Novo on May 29, 1937, v only shortly after Novo visited him in the institution at Pineville, he indicated as much, requesting that in the future all matters in connection with his case against the companies be referred to him. In this letter he expressed his confidence in Novo and authorized him to accept a compromise of $1,000 net to him (Searcy). Again, on July 11, 1937, he wrote Novo advising him of his receipt of a clipping from the Shreveport Times, mailed to him by a friend in Shreveport, wherein it was reported that the Court of Appeals had disposed of his case adversely. He expressed some concern about not having heard from Novo and again indicated his dissatisfaction with his brother’s presumptuousness in the handling of his affairs in connection with his suit against the transportation companies. In addition to all of this, we have the testimony of the Drs. Thomas Logan McCulloch and James Lyle Knoll, Jr., before the Commissioner to the effect that the Rev. Searcy was of nor-, mal or average mental intelligence.
 

 The fact that the Searcy and Mc-Gregor suits against Novo were successfully prosecuted, while persuasive, cannot be considered conclusive evidence of Novo’s unprofessional conduct in a proceed-' ing of this kind. There the suits were for ordinary money judgments and only a fair preponderance of the evidence was required for their disposition. In disbarment proceedings, on the contrary, the evi- - dence not only ag to the act which forms the basis of the attorney’s unprofessional conduct but also as to the motive with-which the act was done, must be clear and’ convincing. Bradley v. Fisher, 13 Wall. 335, 20 L.Ed. 646; Ex parte Wall, 107 U.
 
 *848
 
 S. 265, 2 S.Ct. 569, 27 L.Ed. 552; Matter of Mashbir, 44 App.Div. 632, 60 N.Y.S. 451; People v. Kerker, 315 Ill. 572, 146 N. E. 439; In re Wellcome, 23 Mont. 450, 59 P. 445; People v. Matthews, 217 Ill. 94, 75 N.E. 444; People v. Harvey, 41 Ill. 277; People v. Barker, 56 Ill. 299; People v. McCaskrin, 325 Ill. 149, 156 N.E. 328; People v. Lotterman, 353 Ill. 399, 187 N.E. 424; People v. Hammond, 356 Ill. 581, 191 N.E. 215; In re Petersen, 208 Cal. 42, 280 P. 124; Ring v. State Bar of California, 218 Cal. 747, 24 P.2d 821; In re Lynch, 227 App.Div. 477, 238 N.Y.S. 482; In re Ropiecki, 246 App.Div. 80, 282 N.Y.S. 947; In re Lacy, 234 Mo.App. 71, 112 S.W.2d 594; In re Newby, 82 Neb. 235, 117 N.W. 691; In re Evans, 22 Utah 366, 62 P. 913, 53 L.R.A. 952, 83 Am. St.Rep. 794, and the authorities therein cited. The reason for this rule is that the proceeding is not so much for the purpose of seeking the punishment of the man as it is for the preservation of the integrity of the courts and for the salutary effect it has upon the other members of the bar who practice before it. As expressed in the case of Ex parte Wall, 107 U.S. 265, 2 S.Ct. 569, 588, 27 L.Ed. 552, “The proceeding is not for the purpose of punishment, but for the purpose of preserving the courts of justice from the official ministration of persons unfit to practice in them. Undoubtedly, the power is one that ought always to be exercised with great caution; and ought never to be exercised except in clear cases of misconduct, which affect the standing and character of the party as an attorney.” And as expressed in the case of State v. Finn, 32 Or. 519, 52 P. 756, 759, 67 Am.St.Rep. 550, “It is not the purpose of proceedings of this character to punish the accused attorney, as in matters of criminal cognizance, but they are inaugurated and entertained as ‘necessary for the protection of the court, the proper administration of justice, and the dignity and purity of the profession, and for the public good, and the protection of clients,’ ” citing Weeks on Attorneys at Law, Section 80.
 

 In the case of In re Petersen, 208 Cal. 42, 280 P. 124, 128, the court said that according to the great weight of authority “In a matter as serious as the disbarment of an attorney at law, with its attendant degradation and probable effects upon a man’s livelihood,
 
 the accused is, and should be, entitled to every favorable intendment and inference in his favor,
 
 and to the benefit of such proof of good character and reputation as he is able to make,” concluding that when the testimony in such a proceeding is being considered “the conflict between it and that of the accusers must be resolved * * * by consideration of all the circumstances of the case, the animus and desires of the complaining parties, and the impetus given to the prosecution * * In that case the court held that “On the whole record of this part of the proceeding to disbar the petitioner, we can accept it as tending only to raise little more than a suspicion that Petersen may have been decidedly indiscreet in his method of procuring the dismissal of the criminal charge against his client. The evidence does not have the persuasive force the local committee appears to have accorded it.” (Italics ours.)
 

 
 *850
 
 When we analyze the testimony taken before the Commissioner, we find that although Novo admitted he was first employed on a contingent fee basis of 40% of the amount recovered, he asserted that after the case had remained in the court over a period of some two and a half years, being lost in the lower court and on second hearing in the Court of Appeal for the Second Circuit, he visited the Rev. Searcy at his request when he was under treatment at the Central Louisiana Hospital at Pineville, just prior to the appellate court’s final adverse decision rendered on June 30, 1937, and there went over with the Rev. Searcy in detail the difficulties already encountered in the case and those that were likely to be encountered in the future, Searcy agreeing, after the matter had been fully discussed with him, to divide any amount they might recover on a 50% basis, after the deduction of all of the expenses incurred in connection therewith. Novo further testified that after having collected the money awarded the Rev. Searcy by the judgment of the Supreme Court rendered on January 10, 1938, he went to Searcy’s home near Winnsboro on Saturday, February 19, 1938, for the purpose of settling with him; that upon arriving there, at the request of his client, he went into town and got Searcy’s brother Will; that after deducting $100. for expenses incurred in making various and sundry trips in connection with the case, $100 for expenses incurred in going to New Orleans for the purpose of filing an application for a writ of certiorari with the Supreme Court, $40 for the printing of the brief filed in support of the writ, and $300, which had been paid to an attorney employed by him in New Orleans to assist in the preparation of the application for the writ of certiorari and the brief filed therewith; that he wrote out a check for half of the remainder of the amount, or $1,700.69, which .he gave to the Rev. Searcy, receiving from him a receipt in which he acknowledged that “full and final settlement” of the suit instituted by the Rev. A. Cliff Searcy against the Interurban Transportation Company et al., had that day been made by Novo; that this check was immediately indorsed ,by the Rev. Searcy and his mother and placed in the hands of his brother Will, who got into Novo’s car and went with him into Winnsboro, being dropped by Novo at the bank so that he might deposit or cash the check at once.
 

 Novo’s testimony to the effect, that the Rev. Searcy was at home alone when he (Novo) arrived and that Will Searcy and the mother, Mrs. I. W. Searcy, were both present when the settlement was made, is corroborated by the Rev. Searcy, as is Novo’s testimony with regard to the fact that the Rev. Searcy received the check given him in full settlement of the Interurban Transportation Company case, signing a receipt to that effect, and also with regard to the fact that Will Searcy accompanied Novo when he left the house, going to Winnsboro to cash or deposit the check. The Rev. Searcy testified that he accepted the check given him by Novo after there had been some discussion with respect to the modified contract and the expenses incurred. He also admitted that Novo visited him while he was in the hospital but
 
 *852
 
 when asked whether or not he had sent for Novo, he stated he
 
 “didn’t think so.”
 
 When directly questioned as to whether or not his case against the transportation companies had been discussed at the time of Novo’s visit, he denied that he had ever agreed to any change in the contract, as contended by Novo. (Italics ours.)
 

 W. D. Searcy denied that he had been present when the settlement was made, stating that when he arrived at his brother’s home the settlement had just been completed and Novo was about to leave the house. He did admit that he left with Novo, but stated he first called to Novo’s attention the fact that the settlement had not been made in accordance with their agreement and told Novo that he would hear from him (Will Searcy) in the near future about the matter. This was on a Saturday. ' He testified further that on the Monday following he took the check to S. R. Holstein, an attorney in Winnsboro, and, after consulting with him, deposited the check in the Winnsboro bank on that day (Monday). When advised on cross-examination that the check had not only been deposited in the Winnsboro bank on Saturday, February 19, 1938, the day on which it was written, but that, it had also cleared the bank on that same day, he admitted he was in error about taking the check to Holstein on Monday and later depositing it. He corroborates Novo with respect to the manner in which the contract was first entered into, including the fact that Novo insisted upon having the Rev. Searcy visit his office before he would consent to take the case, but he claims that Novo agreed, in the presence of the Rev. Searcy and Jackson Wiggins, to pay half of the expenses that he (W. D. Searcy) might incur in connection with the case. Fie added that he had'never heard of any change in the first contract.
 

 After carefully analyzing the testimony of these three witnesses before the Commissioner, as well as other statements made by them (such as in the affidavit filed with the Alexandria Bar Association and the testimony given during Searcy’s case against Novo), we cannot conclude that the Rev. Searcy did not in fact enter into the subsequent agreement, as has consistently been maintained by Novo, with reference to the distribution of any amount that might be recovered from the transportation companies. While testifying before the Commissioner, the Rev. Searcy, when questioned as to whether Novo visited him when he was in the hospital at Pineville, he said he “didn’t ■ think so.” But we find that during the trial of his case against Novo for the recovery of the funds allegedly illegally withheld by Novo, he answered a similar question in the following manner: “Yes, I asked you to come to see me * * We also find that during that same trial, in answer to the question “Have you ever agreed with Mr. Novo that that amount be raised from forty (40%) per cent to fifty (50%) per cent?” he replied
 
 “Not as I remember.
 
 I will state here, Judge, that my memory has been very-bad since I had that stroke on the bus. I cannot remember like I used to.” In answer to another question as to whether or not he had authorized the deduction of the expenses incurred during the course of the case
 
 *854
 
 against the Interurban Transportation Company et al., and had agreed that the settlement would be made on a fifty-fifty basis after such deduction, he said:
 
 “I don’t remember.”
 
 On another matter pertinent to the issue, we find that the Rev. Searcy denied before the Commissioner that he had ever had any disagreement with his brother Will, yet in his testimony during the course of his trial against Novo, after first denying having had any falling out or quarrel with his brother, when pressed about this on cross-examination, in answer to the question propounded by Novo “Doctor did you not tell me on my visit to the hospital in Pineville that your brother, Wili Searcy, had not treated you fair ? ” he said:
 
 “I don’t think I did. I might have because I don’t remember.
 
 I was in such a condition there, I don’t think my mind was clear enough there to be depended on.” And in answer to the further question “Were you not very sore at him at that time? ” he replied :
 
 “If I was it was brought about by the gossip that was tattled to me there in the hospital.”
 
 In addition to all of this, we think the letter written by the Rev. Searcy on May 29, 1937, shortly after Novo’s visit to him at Pineville, unmistakably shows he was- not pleased with the actions of his brother in connection with his case, .for he specifically instructed Novo not to deal with his brother any more but to deal with him (the Rev. Searcy) thereafter. It is interesting to note that although the Rev. Searcy first denied having had any disagreement or quarrel with his brother when he was testifying before the Commissioner, he later admitted that if he had said so in his letter to Novo dated May 29, 1937, it must have been true, professing at the same time that he could not remember having ever written any such letter, though during the course of his trial against Novo, this same letter was identified by the Rev. Searcy as having been written in his own handwriting. Moreover, when the Rev. Searcy was asked by Novo, during the course of Searcy’s trial against him: “You executed all of these documents, this release and the signing of the check, of your own free will, did you not, Doctor?” he replied:
 
 “I guess I did.”
 
 Later, during this same testimony, “And you accepted that in full settlement, free and voluntarily, is that right?” he answered : “I
 
 did at that time but I wasn’t in the condition to deal with the business. That is the reason I gave it to my brother, because I knew I wasn’t in condition.”
 
 (All of the italics ■ in this paragraph are ours.)
 

 If this settlement was made between the Rev. Searcy and Novo in the presence of W. D. Searcy, inasmuch as the Rev. Searcy states his brother was authorized to act for him and inasmuch as the matter was discussed fully before the settlement was made, as testified to by the Searcys, it is very convincing, to say the least, that Novo satisfactorily settled with his client and in no wise took advantage of him.
 

 W. D. Searcy denied that the settlement had been made in his presence, but we think the contrary is amply borne out by the record. In addition to the testimony of the Rev. Searcy to that effect, we have the affidavit prepared and executed at the re^ quest of the Alexandria Bar Association on March 19, 1938, and signed by the Rev.
 
 *856
 
 Searcy, his brother Will, and his mother, Mrs. I. W. Searcy, wherein it is declared “that all three of affiants were present during the entire interview,” — meaning the interview that took place when Novo made his settlement with the Rev. Searcy at the Reverend’s home in Winnsboro on February 19, 1938. Then, too, we have the statement of T. H. McGregor dated May 11, 1938, “Made To And At The Request Of The Alexandria Bar Association Grievance Committee,” wherein McGregor declares that he was present when Novo was tried on the charge of embezzling the funds which the Rev. Searcy recovered in his suit against Novo (Novo’s retention of these funds likewise forms the basis of one of the charges against him in this disbarment proceeding), where he was summoned as a witness; that he heard the Rev. Searcy, W. D. Searcy, and Mrs. I. W. Searcy testify during that trial, and “They all three testified that they were present at the settlement * *
 

 In the light of all of the testimony in the record in this proceeding, as we find it, it is our opinion that a subsequent agreement was entered into between Searcy and his attorney, as testified to by Novo, and that the settlement made under such agreement on February 19, 1938, was freely and voluntarily accepted by the Rev. Searcy. ^ We must conclude, therefore, that the charge made against Novo in this respect is not supported by the evidence.
 

 There is a more serious charge against Novo, however, and that is the one touching upon his inclusion of an item of $400 as an expense in his accounting to his client, which amount he is alleged to have stated to his client, in the presence of W. D. Searcy and Mrs. I. W. Searcy, was paid to the Supreme Court when he was making application for a writ of certiorari in the Interurban Transportation Company case.
 

 As is pointed out by the Commissioner in his report to us, the testimony of the Rev. Searcy and his brother, Will (Mrs. Searcy did not testify), touching on this point “varies as to the manner or place of depositing this $400.00 and neither could say to whom it had been paid.” Novo emphatically and consistently denies having made any such statement, characterizing it as being “so preposterous that it refutes itself.” He did state that the money had been expended in the following manner: $100 for his personal expenses on trips to New Orleans in connection with the Interurban Transportation Company case, and $300 for the employment of an attorney in New Orleans to assist him in the preparation of his application for a writ of certiorari in the Supreme Court, as well as a brief in support thereof, when he was endeavoring to have the Supreme Court review the judgment of the Court of Appeal for the Second Circuit in that case. The Commissioner, stating in his report that Novo refused to divulge the name of the attorney to whom he had paid the money on the ground it was a confidential and privileged right, recommended that he should be “sternly disciplined,” especially in view of the fact that Novo had failed to avail himself of the right given him by the Commissioner to divulge the name of the attorney in secret within 10 days after the hearing.
 

 
 *858
 
 The failure to account to a client for money collected for him or the appropriation to an attorney’s own use of the funds that have been entrusted to him by his client, are among the most common grounds for the suspension or disbarment of an attorney, “provided the circumstances attending the transaction are such as to satisfy the court that the attorney is acting in bad faith or with a fraudulent purpose.” 7 C.J.S., Attorney and Client, § 23, p. 746. It necessarily follows that if Novo did have an agreement with his client to divide the money recovered from the Tri-State Transit ■Company on a 50% basis after all of the necessary expenses incurred in obtaining such judgment were deducted, as we have con-eluded he did, it was incumbent upon Novo to satisfy his client that the money so deducted as expenses was actually paid for expenses. Ordinarily the settlement that was entered into between the Rev. Searcy and Novo would be conclusive, unless it was proved that the same was obtained through misrepresentation or fraud.
 

 In testifying on this phase of the case before the Commissioner, the Rev. Searcy ■stated that Novo had told him in the presence of his brother and mother, at the time of the settlement, that he, Novo, had “slipped four $100.00 bills under the desk blotter; he said he had a friend on the bench who got the money. I think he called his name, but I don’t remember.” Then a member of the Supreme Court Committee on Professional Ethics and Grievances refreshed his memory as to his testimony on this same point during the course of Searcy’s trial against Novo by reading the following excerpts from his testimony:
 

 “Q. Doctor when Mr. Novo was at your house making this settlement do you remember the deductions that he stated he was making from the total amount collected? A.
 
 Only by my brother reminding me in his testimony.
 

 “Q. Do you remember whether he described to you how he paid that Four Hundred ($400.00) Dollars to the Supreme Court? A. Yes, he said he gave the Supreme Court three One Hundred ($100.00) Dollar bills and the rest in small currency.”
 

 Further, during the examination of the Rev. Searcy before the Commissioner, he was also asked “Was anybody present besides you and Mr. Novo when he told you? ” and he answered: “My brother, Will, and
 
 my mother, but she is so old she could not remember.”
 
 (Italics ours.)
 

 As pointed out by the Commissioner, there is conflict between the testimony of the Rev. Searcy and his brother as to whom and in what manner the money was alleged by Novo to have been paid. Furthermore, W. D. Searcy contradicts both his brother and Novo by positively denying before the Commissioner that he was present when the settlement was made. He did state, however, that when he questioned the settlement after it had been made, that Novo made the assertions attributed to him, It is interesting to note that when the Rev. Searcy was questioned as to whether or not he had authorized the employment of associate counsel, he stated:
 
 “I don’t remember.”
 
 Novo not only contends that he was so authorized, but he testified that he advised W. D. Searcy in a postscript to a
 
 *860
 
 letter written him soon after Novo returned from filing the application for a writ of certiorari with the Supreme Court in New Orleans that he had employed such counsel. This is denied, by W. D. Searcy, but we find that the letter is torn below Novo’s signature. This, in our opinion, strongly supports Novo’s statement particularly when we consider that the settlement between the Rev. Searcy and Novo was only entered into after a discussion which, if we must believe the Searcys, was an extended one. (Italics ours.)
 

 The entire record in this proceeding, when carefully studied and analyzed, shows a series of conflicting and inconsistent ' statements on the part of the Searcys. For example, we find that included in the demands made by the Rev. Searcy at the time he sued Novo, is an item of $346, claimed to have been spent by W. D. Searcy, the agent and attorney in fact of the Rev. Searcy, as expenses incidental to the Reverend’s case against the transportation companies and due under the original agreement entered into between W. D. Searcy and Novo for the handling of the Reverend’s case. It will be remembered that Novo would not take the case after a discussion with W. D. Searcy alone, but insisted that the Rev. Searcy be brought to his office for a conference with respect to the matter, and that, accordingly the Rev. Searcy did visit his office. During the trial of his case against Novo, the Rev. Searcy testified that the expenses he understood Novo was to incur were those connected with the attorneys associated with him. When asked “Was there any understanding between you as to the necessary expenses of getting witnesses to Alexandria and taking care of them when they were there?” he replied:
 
 "I don’t know what he had in mind. I had in mind the lawyers.”
 
 When W. D. Searcy was questioned during the trial of that same case about his understanding with reference to the expenses in the case, he stated he understood the expenses were to be split between him (W. D. Searcy) and Novo on a 50-50 basis, explaining that if the case was won, Novo would pay all of the expenses, while if it was lost, he (W. D. Searcy) would pay them. He stated that this was the agreement between him and Novo, made in the presence of Jackson Wiggins and Raymond C. Parker when he first went to see Novo about taking the case. Parker did not testify in the case, and Wiggins denied any knowledge of such an agreement. When testifying before the Commissioner, W. D. Searcy stated that at the time he first went to see Novo, Novo said “If you will get the witnesses and put them here, I will taire it for 40%,
 
 and pay half the expenses of the witnesses.”
 
 to which he had replied “That is fair enough.” (Italics ours.)
 

 We are inclined to believe that a great deal, if not all, of Novo’s trouble with respect to these cases has been due directly to his failure to pay W. D. Searcy for the expenses he claimed to have incurred in connection with the Reverend’s case against the transportation companies. Everything points in that direction. We find that it was he who went to S. R. Holstein, the Winnsboro attorney, after Novo had settled
 
 *862
 
 with the Rev. Searcy, and employed him for the purpose of recovering from Novo the money allegedly illegally retained by him, himself paying Holstein $50 as a retainer fee in the Reverend’s case against Novo; further, that it was at his instigation that Holstein made demand on Novo in writing for the restitution of this amount (the Rev. Searcy testified he knew nothing about any such letter). The Rev. Searcy admits that it was upon the advice of his brother and Holstein that he preferred embezzlement charges against Novo and had him arrested. On the very day the suit was filed by Searcy against Novo, W. D. Searcy talked to Novo on the telephone and went to his office to discuss the matter, at that very moment having in his possession the papers for the filing of the suit against Novo. As a matter of fact, Novo was arrested by the Sheriff of Franklin Parish while he was in the midst of arguing exceptions filed by him in the Reverend’s case against him, the arrest being predicated on the embezzlement charges that had been preferred against him by the Rev. Searcy. W. D. Searcy not only told Novo that he was going to get him, but he admits that he made such a statement while Novo was being tried on the charge of embezzlement in Franklin Parish. W. D. Searcy also told Novo, after he had been exonerated of the embezzlement charges, that he would be down in Alexandria to finish up the job. (It is obvious that in referring to finishing “up the job” W. D. Searcy referred to Novo’s disbarment, for just before Searcy made this statement, all three of the Searcys had made a joint affidavit charging Novo with the misappropriation of the funds of the Rev. Searcy, which affidavit was given to the Grievance Committee of the Alexandria Bar Association at about the same time the charges of embezzlement were made before the Grand Jury of Franklin Parish.) W. D. Searcy, on cross-examination during the trial of Searcy’s case against Novo, was questioned by Novo as follows: “Then you cursed me when I left?” and he answered: “No, but if I had been at home the day you came looking for me you might not have been here!”
 

 It is our opinion, therefore, that according to the facts of this case as we find them to be, the Supreme Court Committee on Professional Grievances and Ethics has failed to prove with legal certainty that Novo retained money belonging to his client in bad faith or with fraudulent purpose and intent unless we can assume from the fact that Novo refused to divulge the name of the counsel associated with him in the prosecution of the Interurban Transportation Company case before this court that he did not in fact employ such counsel, using this as a subterfuge to defraud his client of the amount allegedly paid to such counsel. Unquestionably Novo’s disclosure of the attorney’s name or a receipt from such attorney would have completely set that question at rest. During the course of the trial of Searcy’s case against him, Novo merely said he did not want to divulge the name of his “contact” because of the interference in his affairs by persons who were not friendly toward him. Before the Commissioner he added, in effect, that he was being persecuted' enough and for him to
 
 *864
 
 divulge the name of his friend and associate would only give his enemies someone else to persecute. He also maintained that he did not have to divulge the name of his associate, since the matter was a privileged one.
 

 We cannot agree with Mr. Novo’s stand in this respect. We think that if he had named the attorney, he would have completely removed all doubts and suspicions aroused by his actions. We must conclude, therefore, that his actions with respect to the item of $300 allegedly paid to the attorney associated with him in applying for a writ of certiorari to this court in Searcy’s case against the transportation company merit some disciplinary action.
 

 We now pass to the charge against Novo with reference to his alleged unethical conduct toward T. H. McGregor, his associate counsel in the Interurban Transportation Company case.
 

 Novo’s testimony on this point is to the effect that after the Interurban Transportation Company case was lost in the lower court, it was agreed, at the request of the Rev. Searcy, that McGregor, who had been granted a furlough from the United States government in the meanwhile, should become associated with him because of his long experience at the bar and on the bench; that McGregor was to assist him in the handling of the case on appeal on a contingent basis, McGregor to receive an eighth of the amount recovered, this amount to be paid by the Rev. Searcy; that after the Court of Appeal affirmed the judgment of the lower court, Mc-Gregor, having been recalled in the service of- the government, abandoned the case, surrendering his file in connection therewith to Novo.
 

 McGregor denies that he ever abandoned his connection with the case or that he turned his file over to Novo. He further testified that his portion of the amount recovered was to be paid out of Novo’s 40%.
 

 Thus it may be seen that he have the contradictory statements of two attorneys who, at least until these proceedings were brought against Novo (and it must be borne in mind that it was McGregor himself who. recommended Novo to the Searcys), were of equal good character and reputation. Without expressing an opinion as to which of the two attorneys is right or wrong, our appreciation of the evidence in the record on this phase of the case is that it is not sufficient to warrant the taking of any disciplinary action against Novo.
 

 The other testimony and evidence that we have, in addition to Novo’s and Mc-Gregor’s, is not at all satisfactory. When the Rev. Searcy was asked whether or not he had authorized Novo to associate McGregor in the case at Searcy’s expense, he replied that he did not remember. According to W. D. Searcy’s version of the matter, McGregor was to be paid out of the 40% Novo was to receive. Considering other testimony of W. D. Searcy as to what was to be paid out of this 40% of Novo’s, we find that Novo was to refund him (W. D. Searcy) all of the expenses he incurred in connection with the case in the event it was won. This amounted to $346, according to the statement submitted by W.
 
 *866
 
 D. Searcy at the time the Rev. Searcy sued Novo. We also find that W. D. Searcy testified Novo was to pay Raymond C. Parker, the attorney and friend who accompanied him when he first called on Novo with reference to the case, 15% of the amount recovered. McGregor, in his letter to Sheriff Downs, wherein he informed the sheriff that he had a 12%% interest in the amount of the judgment held by the sheriff, also gratuitously informed the sheriff that S. R. Holstein was an attorney of record in the case and interested in the funds held by the Sheriff. (Holstein has never claimed he was entitled to any portion of this amount although he, like McGregor, was an attorney of record in the case. Parker likewise has not claimed any interest in the money.) It seems to us that if Novo was to pay Parker, Holstein, Mc-Gregor, and W. D. Searcy all out of his 40% interest, as well as pay all of the expenses he incurred in the trial of the case, he took the Rev. Searcy’s case and fought it through the courts from August 5, 1935, to February
 
 7,
 
 1938, when the rehearing in this court was denied, as a charitable gesture on his part, himself intending to make monetary contributions to that charity in order to take care of everything placed upon his shoulders.
 

 The last charge against Novo appears in Article 8 of the petition for disbarment filed by the Supreme Court Committee on Professional Ethics and Grievances as follows : “That defendant has a total lack of respect for the Ninth Judicial District Court, which is calculated to bring the Court to disrepute, as is shown by the letter and other correspondence from Honorable R. C. Culpepper, District Judge, Ninth Judicial District, which is attached hereto and made a part hereof for all purposes.”
 

 These letters are five in' number. The first, dated March 5, 1934, is addressed to Judge Culpepper by the Director of Insurance of the Veterans Administration in Washington, D. C. In it he calls to the judge’s attention the fact that a judgment had been entered by him in the matter of the Succession of Arthur Richard Chopin recognizing the heirs and putting them in possession of the property of the deceased and that in order for the Veterans’ Administration to pay these heirs the insurance due them, it would be necessary for the Veterans’ Administration to secure a certificate from the court to the effect that an administration of the Chopin estate was not deemed necessary in settling the succession. The director further informed the judge that Novo, the attorney handling the succession, had been advised to that effect, but had written them telling them that both the judge and the clerk of court had advised him they had never heard of such a certificate. On March 9 Judge Culpepper answered the letter, advising the Director of ■Insurance of the Veterans’ Administration that he had examined the record in the Succession of Chopin and found that Chopin had died in 1921; that his surviving widow had then applied to and was appointed by the court the administratrix of the succession upon the allegation that Chopin had left considerable debts; that nothing further had been done in the matter until the children of Chopin came into
 
 *868
 
 court with a petition in which they advised their mother had died on August 11, 1933, asking that they be recognized as the heirs of their deceased father and as such sent into possession of his estate; and that judgment had been signed accordingly. Under these circumstances, the judge advised the Veterans’ Administration, he could not certify that an administration of the estate was not necessary. The Director of Insurance acknowledged receipt of the Judge’s letter on March 19th, and thanked him for it. In the meanwhile, on March 12, Judge Culpepper had addressed a letter to Novo, informing him that if he did not know the necessary proceedings to take in securing the required certificate, he should follow the procedure outlined in detail by the judge in the letter. The judge further commented: “I had no thought that you would take exceptions to my letter. (Meaning the Judge’s letter to the Veterans Administration on March 9.) The Department wrote me direct; I replied direct and explained why I could not issue a certificate. If, when you came to my office Saturday, you had simply asked me what procedure to take in order to clear this matter up, I would have gladly told you. So, I am now writing this letter giving you these suggestions for you to act upon if you see-fit.” (Brackets ours.) On the same day Novo acknowledged receipt of the Judge’s letter, advising him that he would be prepared on March 20 to present the necessary information to the court in order that the certificate might be secured, and that he would appreciate being advised if that date was not satisfactory to the judge.
 

 We find-nothing in these letters to indicate any misconduct on the part of Novo. However, in reading the testimony taken before the Commissioner, we do find that Judge Culpepper testified to the effect that when he refused to sign the certificate as requested, Novo became angered and threatened him with defeat' if he should ever run again for office, the judge explaining that because of Novo’s size and strength, in proportion to the judge’s, he (the judge) was afraid that Novo would hurt him and told him that he would call the sheriff if he did not leave his office.
 

 “The obligation which attorneys assume, when admitted to the bar,
 
 to maintain at all times the respect due to the courts of justice and judicial officers, is -not discharged by merely observing the rules of courteous demeanor in' open court, but
 
 includes abstaining both in and out of court from insulting language and offensive conduct tozvard the judges personally for their judicial acts, and a zholation thereof constitutes a ground for suspension or disbarment.
 
 * * * While attorneys have the widest latitude in differing with, and criticizing the opinions of, the courts, yet when they resort to * * * unwarranted assaults on the courts whose officers they are, they violate their duty and obligation and are subject to suspension or disbarment.” 7 C.J.S., Attorney and Client, § 23, p. 752. (Italics ours.)
 

 Novo denies he threatened Judge Culpepper or addressed him in any manner other than that of his usual manner in discussing such matters. He admits, however, that he has a positive way of expressing
 
 *870
 
 himself. We think the testimony of the judge hears out Novo’s contention in this respect, for, when Novo questioned the judge on cross-examination about the time he had put Novo in jail for contempt, Novo asked: “You said I was in a belligerent manner. What do you mean ?” to which the judge replied: “Mr. Novo, you have a habit of jumping up and in a very loud tone of voice, making a statement.” When Novo questioned further “Would you call that a belligerent manner?” the judge answered: “You jump up before the court and you have a very loud, strong voice, coarse voice, and you talk just like you were going to eat up the judge and the courtroom and everybody around the bar. You have an unusually belligerent manner and when a lawyer does those things, the court does not appreciate it, and then, when in that manner, you accuse the court of not giving you justice, or deciding the case against you, you could not blame a judge in finding you in contempt.”
 

 We find in the evidence taken before the Commissioner also the testimony of Judge Leven L. Hooe, also of the Ninth Judicial District Court, to the effect that so far as he had been able to observe Novo had always conducted himself in a very respectful and obedient manner when he was practicing before his section of the court and that he could remember no occasion when Novo had been disrespectful or discourteous to the court.
 

 Two attorneys of the Alexandria Bar Association were called before , the Commissioner to testify with respect to statements allegedly made by Novo during the trials of the cases of Searcy and of McGregor against him, to the effect that Novo had said he had employed McGregor’s services for his influence with the Court of Appeal for the Second Circuit, of which McGregor had formerly been a member. (In explaining those statements, Novo stated that when Judge McGregor returned to Alexandria, he had intimated he could be of valuable as- ■ sistance to Novo in the preparation of briefs and pleadings before the Court of Appeal, since he had been a member of that court and was familiar with the routine of the appellate courts; that he had no intention of intimating that McGregor meant to do anything unethical, such as improperly influencing the court, but he felt sure McGregor would be able to assist him because, in addition to being familiar with the workings of the court, he was a lawyer of many years experience; and that he was glad to have his assistance since the Searcy case was his first big case and he was anxious to put forth his best efforts in winning it. Mr. Novo’s explanation in this respect was accepted by the Commissioner as being satisfactory and we see no reason to disagree with that conclusion.) When on cross-examination, Mr. Hunter, one of the attorneys, testified that his relations with Novo had always been extremely friendly and pleasant and that he had never heard of Novo taking advantage of anyone in the trial of any lawsuit. He added that he had never seen Novo in any trouble, although he (Novo) was a little “hot-headed.” The other attorney, Cleveland Dear, former district attorney of the Ninth Judicial District Court and also former member of Congress from that section of the state, stated under cross-examination that he could not recall any sharp
 
 *872
 
 practice on the part of Novo in the trial of any case; that his experience, in trying several cases with Novo when he was a young attorney before the Alexandria bar had been very pleasant. When asked the question: “And do you'know of yourself, or heard of any unfair advantages I took of any other members of the bar, do you?” Mr. Dear stated that he did not want to testify about that, for he did not want to testify about anything that he had heard. However he reiterated that all of his dealings with Novo had been pleasant.
 

 After a careful study of Judge Culpepper’s testimony in connection with his statement given at the request of the Alexandria Bar Association’s Grievance Committee, as well as in connection with the testimony of Judge Hooe and the two members of the
 
 bar who
 
 testified before the Commissioner, we cannot say that this charge against Novo was proved with the legal certainty required in such proceedings, or that it is sufficient to justify the taking of any disciplinary action against Novo.
 

 This brings up the question of what action should be taken against Novo for his failure to disclose the name of the attorney associated with him, and to whom he claims to have paid the sum of $300. Would his disbarment for this reason alone be justified or should one of the lesser punishments be meted out, such as suspension or reprimand?
 

 As was very aptly stated in Thorton’s work on Attorneys at Law, “The solution of this question frequently involves too many considerations of public policy and concrete justice, dependent upon the gravity and consequences of the misconduct, the age, character, and reputation of the attorney, the probability of his reformation, the circumstances attending the commission of the offense, and the like, that no fixed or arbitrary rules have been, or properly can be, adopted by the courts. * * * It is a generally accepted principle, however, that since the primary purpose of a disbarment proceeding is not punishment, but the protection of the courts and the public, disbarment should never be decreed, if any discipline less severe would accomplish the desired result, as when there are prospects that the attorney’s conduct and character may undergo reformation.” Vol. 2, Section 894. See, also, Lenihan v. Commonwealth, 165 Ky. 93, 176 S.W. 948, L.R.A.1917B, 1132.
 

 Justice Field of the United States Supreme Court, in his famous dissenting opinion in the case of Ex parte Wall, 107 U.S. 265, 2 S.Ct. 569, 614, 27 LEd. 552, followed in later cases, said: “To disbar an attorney, is to inflict' upon him a punishment of the severest character. He is admitted to the bar only after years of study. The profession may be to him the source of great emolument. If possessed of fair learning and ability he may reasonably expect to receive from his practice an income of several thousand dollars a year — equal to that derived from a capital of one or more hundred thousand dollars. To disbar him having such a practice is equivalent to depriving him of this capital. It would often entail property upon himself and destitution upon his family. Surely, the tremendous power of inflicting such a punishment should never be permitted to be exercised unless absolutely necessary to protect the court and'the public from one shown by the clearest legal
 
 *874
 
 proof to be unfit to be a member of an honorable profession.”
 

 This same author, in the case of Bradley v. Fisher, 13 Wall. 335, 355, 20 L.Ed. 646, said: “A removal from the bar should
 

 therefore never be decreed where any punishment less severe — such as reprimand, temporary suspension, or fine — would accomplish the end desired.”
 

 Applying the foregoing to the facts of this case, we do not think that we are warranted in imposing a punishment of more than a temporary suspension on the defendant.
 

 In fixing the length of the suspension to be meted out in this case, we must take into consideration the fact that although Novo has been honorably practicing his profession before the bar since 1927, this is the first breath of suspicion, unless we take into consideration the other charge made against him in. this same proceeding in the Ollie Horner matter — and a most simple and unbiased examination of the facts in that case disclos’e it never should have been included as a charge in this proceeding — that has ever been cast upon his professional conduct. The fact that he has been humbled and humiliated for a period of more than four years should also be taken into consideration. In addition to the civil action brought against him by Searcy and his payment, with costs, of the demand in that case, h-e has been branded an embezzler and forced to stand trial on such charges, to say nothing of the scorn and contempt in which he has been held by the bench and bar, as well as by the people in the rather small community where he lives. All of this undoubtedly caused the defendant and his family much suffering, not to mention the financial losses which Novo has unquestionably sustained and the future effect upon his life and practice.
 

 It is our opinion, therefore, that under the particular facts of this case a suspension of six months is sufficient punishment and will accomplish the end desired.
 

 For the reasons assigned, it is ordered, adjudged and decreed that Lee J. Novo be and he is hereby suspended from the practice of law in the State of Louisiana for a period of six months, such period to begin from the day this decree is handed down.
 

 O’NIELL, C. J., is of the opinion that the decree in this case should require the defendant to give a more satisfactory accounting of the $400 which he deducted from the amount which he collected for his client; that the decree should require him especially to give the name of the attorney to whom he says he paid $300 in New Orleans for assisting in the matter of the petition to the supreme court for writs of certiorari and review ; and that the decree should require the defendant to furnish this accounting and information within a very short time, to be fixed in the decree, or be permanently disbarred.