LE BLANC, Justice.
On January 3, 1946, a Federal Grand Jury sitting in the District Court of the United States for the Eastern District of Louisiana, New Orleans Division, returned a true bill against William T. Burton, James A. Noe, Joe T. Cawthorn and Marcel F. La Branche, charging them with having entered into a conspiracy with Edwin H. Oliveira, Bernard R. Hughes and John Joseph Astorias, the. latter three not being indicted, and also various other per-, sons whose names were unknown, to corruptly influence, obstruct and impede the due administration of justice in a criminal prosecution brought and pending in said Court. The prosecution referred to involved an indictment against William T. Burton, charged with wilful attempt' to evade Federal Income taxes of the ,W. T. Burton Company, Inc.
The indictment recites in detail various overt acts committed by each of the alleged co-conspirators in their efforts to influence prospective petit jurors summoned to serve on the tax evasion case against William T. Burton, and in otherwise contacting and talking to several jurors, and among themselves, about payment for services and receiving the money therefor. Joe T. Caw-thorn, . one of the alleged conspirators named in the indictment returned on January 3, 1946, was one of the attorneys representing William T. Burton in the tax evasion case. That case had resulted in a mistrial on the first hearing and in an acquittal on the second hearing on which some of the petit jurors alleged to have been improperly influenced served.
William T. Burton, James A. Noe, Joe T. Cawthorn and Marcel F. La Branche were prosecuted in the United States District Couj-t for the Eastern District of Louisiana on the indictment returned against them on January 3, 1946, the trial having begun on May 3, 1948, and on May 18, 1948 the jury returned a verdict of “guil- ' ty” as to the defendants Burton, Cawthorn and La Branche and “not guilty” as to the defendant Noe'. In due time the- three defendants who had been convicted were each sentenced to serve two. years im-prisonment and to pay a fine of $10,000. On appeal to the United States Court of Appeals, Fifth Circuit, the verdict and sentences were affirmed and subsequently certiorari- was denied. by., the.- United States *887 Supreme Court. Burton v. U. S., 175 F.2d 960, 176 F.2d 865; Id., 338 U.S. 909, 70 S. Ct. 347, 94 L.Ed. 560. As a result of his conviction, this disbarment proceeding against Joe T. Cawthorn was instituted.
The felony with which Cawthorn was charged is denounced by Section 37 of the Criminal Code of the United States, Title 18 U.S.C.A. § 88 (now 18 U.S.C.A. § 371) which defines a conspiracy as follows:
“Conspiring to commit offense against United States. If two or more persons conspire either to commit any offense against the United. States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years or both”.
Section 135 of the Criminal Code, 18 U.S.C.A. § 241 (now 18 U.S.C.A. § 1503) provides that it is an offense to “corruptly * * * endeavor to influence * * * in any court of the United States * * * any grand or petit juror * * * in the discharge of his duty * * * ”.
Under Section 335 of the Criminal Code, Title 18 U.S.C.A. § 541 (now 18 U.S.C.A. § 1), all offenses punishable by death or imprisonment for a term exceeding one year are deemed felonies.
By the provisions of section 10, Article 7 of the Louisiana Constitution, this court is vested with exclusive original jurisdiction “in all disbarment cases involving misconduct of members of the bar, with the power to suspend or disbar under such rules as may be adopted by the court * * *”. Rule XVII of the Rules of this Court prescribes that “All matters touching upon the discipline and disbarment of members of the bar shall be governed by Article XIII of the Articles of Incorporation of the Louisiana State Bar Association adopted as the rules of this Court on March 12th 1941”. LSA-R.S. Title 13. Section 12 of Article XIII of the Act of Incorporation of the State Bar Association provides as follows:
“Section 12. Member convicted of felony. Whenever any member of the bar shall be convicted of a felony and such conviction shall be final, the Committee may present to the Supreme Court a certified or exemplified copy of the judgment of such conviction, and thereupon the court may, without further evidence^ if in its opinion the case warrants such action, enter an order striking the name of the person so convicted from the roll of attorneys and cancelling his license to practice law in the State of Louisiana. Upon the person so convicted being pardoned by the President of the United States or Governor of this State, the Court, upon application may vacate or modify such order of disbarment.” Rules following LSA-R.S. 37:218.
*889 Following the procedure outlined, and as approved by this Court, the Committee, after setting out the defendant’s conviction as pointed out, prayed, in its petition filed in this Court, for a rule ordering him to show cause why his name should not be stricken from the roll of attorneys and his license to practice law in the State of Louisiana cancelled.
In response to the rule defendant filed first an exception to the form of proceeding, claiming that there is no authority in law or in the Rules of Court for the summary action being taken against him. In the alternative he filed various other exceptions, one attacking the constitutionality of the rule under which the proceeding was brought, on several grounds, one of prematurity and also one of no right or cause of action.
Simultaneously the defendant filed his answer, under reservation of his exceptions. In his answer he denies, if the petition so meant to charge him, that he was actually guilty of a conspiracy against the United States. He denies that the Committee has presented any competent evidence of misconduct on his part and denies that his name should be stricken from the roll of attorneys of this State and that his license should be revoked. He denies also that the documents annexed to the Committee’s petition, consisting of an indictment, verdict and sentence, laid in and imposed in a foreign court, can be adduced as proof before this Court, when exercising its original jurisdiction, of any fact whatsoever, such documents representing only the conclusions of others without presentation of any of the evidence upon which they were found. He further denies that he has been guilty of any violation of the laws of Louisiana relating to the professional conduct of lawyers to the practice of law; that he has been guilty of any wilful violation of any rule of professional ethics and that the record in the criminal prosecution in the United States District Court for the Eastern District of Louisiana contains evidence of such conduct attributable to him.
In the alternative defendant alleges that he is informed, believes and alleges that a witness for the prosecution in the criminal case in the United States District Court has, since his conviction, openly declared that his testimony was not according to his recollection of the facts, but was shaped by suggestions made to him by others, and that he adopted such suggestions while under nervous stress and the influence of a fear that brought him to a near collapse.
In a further alternative he alleges, on information and belief, that he can produce other evidence, not available to him during his trial, that will confirm his innocence, and will demonstrate the falsity of the charges under which he was convicted.
Defendant’s exceptions were orally argued and thoroughly briefed at the time they were submitted to the Court on February 16, 1951 and taken under advisement. On March 9, 1951, on motion of his coun *891 sel and at his personal request thereto appended, all exceptions filed by him were ordered overruled and that left the matter ready for trial on the issues presented in the answer.
Under its rules the Court appoints a Commissioner to hear the testimony and receive the evidence in Chambers, in any such case, if the Court deems it advisable to receive testimony in that way instead of hearing it in open Court. Acting under the rule, the Court appointed Mr. Moseman R. Simoneaux, a qualified lawyer, to act as Commissioner and, .in due course, he heard the testimony submitted to him and made his report to the Court which included a recommendation that the defendant be suspended from the practice of law for a period of five years. The Committee filed numerous exceptions to the Commissioner’s report and prayed for judgment of absolute disbarment. Defendant also filed an opposition to the report and the recommendation therein made and asked that it be rejected and the proceedings dismissed. It is urged on his behalf that the Commissioner’s findings of fact and law are correct but that his recommendation of suspension is inconsistent with his finding and that it was made merely out of consideration for the jury’s verdict and should be rejected by the Court.
The Committee takes the position that the Commissioner erred throughout the hearing before him and that he far exceeded the law, as announced in the cases of Louisiana State Bar Ass’n v. Connolly, 201 La. 342, 9 So.2d 582 and Louisiana State Bar Ass’n v. Connolly, 206 La. 883, 20 So. 2d 168. The Committee’s complaint is that the Commissioner has, in effect, re-tried the case in the United - States District Court in which defendant was one of the accused parties convicted of a conspiracy to defraud the United States by corruptly endeavoring to influence members of the petit jury in that case. Practically all of the Committee’s exceptions and assignments of error stem from the Commissioner’s examination of the record in that case and his independent findings after examining the evidence in that record. From the record of the proceeding before the Commissioner, it would appear that he was in serious doubt concerning his duties and his prerogatives and we are left with the impression that he had certain misgivings as to the logic and the soundness of the decisions in the two Connolly cases.
Of course the Commissioner was bound by the decisions in those cases regardless of any views he may have entertained with regard to their soundness. Especially should he have held himself so bound in the present proceeding since the defendant himself had joined his personal request to his counsel’s motion that all the exceptions which had been filed be ordered overruled. There is nothing in the Connolly cases to cause confusion in the trial of these dis-> barment cases.
*893 What the decisions in those cases stand for, as far as is pertinent to the present discussion, is that the conviction of an attorney, of a felony, in either a State or Federal Court, may set out a prima facie case of misconduct authorizing disbarment and that the rule of this Court so providing in substance, is one of evidence affecting the burden of proof which is then placed on the defendant to go forward with evidence at a hearing before the Commissioner and show that he, notwithstanding the judgment of conviction, has not been guilty of such misconduct or transgression as to warrant his suspension or disbarment. As far as the conviction is concerned, there is nothing which this Court can do to set it aside. However, while it is conclusive of the attorney’s conviction, it is not conclusive as to the misconduct on which he is sought to be suspended or disbarred. With regard to misconduct,' the conviction only gives rise to a rebuttable presumption and the Court is then called on to decide whether the presumption thus created, if not'rebutted, is one which convicts the defendant of such misconduct as to justify his suspension or disbarment.
The second Connolly case, La. State Bar Ass’n v. Connolly, 206 La. 883, 20 So.2d 168, 172, presents a classic example of the soundness and reasonableness of this construction of the rule in its application to a given cause. There, the defendant attorney, who was a married lady, pleaded nolo contendere in the Federal Court to a charge of wilfully attempting to defeat and, evade the payment of income taxes and her disbarment was sought on the ground of her conviction which had created a prima facie case of misconduct on her part. She was given the opportunity of producing countervailing proof as to misconduct before a Commissioner appointed by the Court and the Commissioner, after considering the same, recommended that the proceeding be dismissed. In following the recommendation we stated:
“Had respondent offered no evidence to overcome the prima facie case, we would be justified in disbarring or suspending her on the strength of the judgment. Such was the situation in Louisiana State Bar Association v. Steiner, 204 La. 1073, 16 So.2d 843. Here, however, the presumption created by the judgment’s introduction, in our opinion, has been successfully refuted. To our minds the explanation provided through respondent’s evi«dence is plausible. It is not at all unusual for a husband, thoroughly proficient in matters of accounting and finance, to assume full responsibility in the preparation and filing of the tax return of the wifes even though the latter be a practicing lawyer and the producer of the greater portion of the community’s earnings. Quite appropriate to this observation is the following extract taken from the Commissioner’s report:
*895 “ 'Do we not know that many of us, even among the oldest and most conscientious members of the bench and of the bar, have preferred to delegate to accountants the tedious and time-consuming preparation of exceedingly complicated and baffling income tax returns under everchanging Federal statutes, so involved and intricate as to now require complete revision and simplification by the Congress ?’ ”
The sole and only issue that should be considered in the present case, therefore, is whether or not the respondent has, by competent and sufficient proof, refuted the presumption of misconduct created by the judgment of conviction of a felony as set out in the allegations of the petition for disbarment. To meet the issue, defendant, for the greater part of his answer, raised questions of law which were foreclosed by the overruling of his exception. The remaining issues were presented in the alternative allegations of his answer, (1) that one of the prosecuting witnesses at his trial had, since the trial, openly declared that the testimony was not according to his own recollection of the facts, but was given under duress and suggestion, and (2) that he was now in possession of new evidence which would refute the presumption of misconduct. These issues presented questions of fact on which the Commissioner was to hear evidence and make such rulings on its admission as were consistent with the law as laid down by this Court in cases of this character. Fie could, if he so deemed necessary, examine the record of the criminal case in which defendant was convicted, not for the purpose of construing the testimony of any of the witnesses but merely for the purpose of comparing the testimony in the record with that of the witnesses who may testify before him and of properly weighing and giving effect to their testimony as he hears it.
The two issues of fact presented in defendant’s answer may be considered together as they arise out of the claim that a man named Oliveira who was a witness for the Government in the criminal case had given false testimony. We will now direct our attention to that issue.
Besides giving his own testimony, the defendant, in order to prove the allegations of his answer, produced that of Marcel F. La Branche, one of his co-defendants who was convicted with him in the criminal case, Frank J. Looney, his attorney, and Robert H. Brothers. In addition to these, he offered ten character witnesses among whom were included three district judges and one district attorney.
The witness, Brothers, testified quite at length. The gist of his testimony is that one of the prosecuting witnesses at the time of the criminal case in which defendant and the others had been convicted, had admitted to him, sometime about the middle *897 of January, 1950 that he had committed perjury and freely expressed to him his regret that these men should have been made to suffer as they did on account of his per-, jured testimony. He states that the man told him, in effect, of the torment he was undergoing; that he was conscience stricken and seemed to want to unbosom himself.
The circumstances under which he relates that this confidential conversation took place appear to be a bit unusual. Whilst he says that he knew this witness, who turned out to be Edwin A. Oliveira, having several times seen him going to the Jesuits Church on Baronne Street and also in hotel lobbies, he professes no intimate acquaintance nor any particularly close relations with him in any manner. On this particular day in January, 1950, which was a Sunday, he was standing at the corner of Canal and Baronne Streets, in the city of New Orleans, and he saw Oliveira when he was either going to or coming from church. He says he spoke to him and, to quote him, “found him in a very highly nervous, remorseful mood, and more or less anxious to talk to me, and he did.” He states that he then told him how he had been harassed and, in effect, coerced by the Federal Government investigators and told by them what to say when he testified.
He says that he then asked Oliveira why he didn’t have the manhood to go to the proper authorities and tell them about this and he told him he feared that if he did he would be charged with perjury. He says that he then suggested to Oliveira that he go with him to see Mr. Frank Looney, Cawthorn’s lawyer, who was then at the Monteleone Hotel and talk to him; that Mr. Looney was a most honorable man who stood very high in legal matters and also in his church. Oliveira told him that “he would love to” and they both went to see Mr. Looney at his hotel room.
The witness states that at that meeting he told Mr. Looney that Oliveira had told him that “about 80 percent of what he testified to was words they (meaning the government investigators) had put in his mouth and that wasn’t true”. Oliveira then corrected him about the percentages and said that, if he had told him 80 percent, it was “an illustration or a figure of speech” but he would say that it was “a majority” of what they told him to say that was not true. Mr. Looney then warned Oliveira that he was Cawthorn’s lawyer and that anything he was told he would be obligated to report to his client. Oliveira nevertheless went on to tell Looney that “he had testified that he had seen Mr. Burton on a number of occasions, when as a matter of fact he had not seen him at all”. Mr. Looney again warned him that that amounted to perjury, whereupon Oliveira said “Judge I would put it in the newspapers or you could put it in the newspapers, what I told you.”
Mr. Looney testified that on a Sunday in the middle of January 1950, Oliveira did come to his room accompanied by Broth *899 ers; that before Oliveira said anything he told him he had better consider because his statements might be contradictory to what he had testified to and he might be involved in trouble, whereupon, Oliveira told him “I don’t care if you publish it in the papers”. He then went on to tell him how he had been treated by the Federal Agents and, in substance, said that they had made up the statement for him to say that he had seen Burton several times, whereas, he had never spoken to Burton at any time. Mr. Looney then told him that he did not represent Mr. Burton, that he was interested in knowing whether he had seen Cawthorn on a particular occasion he had testified about or at any other time, and he said “I can’t remember that”. There was then some conversation between them relating to a written statement prepared by some other person whose name is not mentioned. He gave Oliveira the statement to take with him to consider whether he would sign it. Oliveira took the statement with' him, returned the next day and told him he couldn’t sign it because it might get him in trouble. He demanded that he give him back the statement and Oliveira told .him he did not have it with him. This he doubted and, upon his insisting, Oliveira reached in his pocket and produced it. He then told him that he didn’t want to have anything more to do with a liar and Oliveira'replied that he had not lied to him. That conclud7 ed- the interview..
LaBranche’s testimony consists mostly of a denial of the matters Oliveira had testified to in the criminal case. He testified however that he did not make any denial at that trial, not having testified at all.
Oliveira, as the record discloses, is employed at different times throughout the year at various race tracks when horse racing is going on. At the time his testimony was sought by the Committee, he was in Lexington, Kentucky and his testimony was taken by deposition before a Notary in that city.
He states that he had known Robert Brothers since about 1945 and admits having talked to him concerning the testimony he gave in the case involving jury tampering. Brothers, he says, was always trying to get him to tell certain facts as to his testimony and repeatedly asked him if he was sure he was telling the truth at all times when he was on the witness stand. He told him that he had told the truth but he seemed to think that he had not. He admits that he accompanied Brothers to Mr. Looney’s room in the Monteleone Hotel and states that he did not stay more than ten or fifteen minutes, as he was in a hurry to go to church. During their conversation, Brothers tried to get him to say in Mr. Looney’s presence that he had lied on -the witness stand and they both tried to get him to state that he had not seen and spoken to Mr. Cawthorn and Mr. Burton. He says that he never stated to either or •both of them .that he had not spoken to *901 either of these men and the Federal Agents never at any time told him to say anything that wasn’t true.
In telling about the written statement “handed to him by Mr. Brothers” he says “It was too ridiculous, and I saw no reason to sign it and say that I had perjured myself while on the stand and then turn around and sign this and say I lied on the stand. By my telling the truth all the way through the case I knew that I was doing the right thing, although it hurt me to testify against my friend, Mr. Marcel LaBranche, and also Mr. Burton and Mr. Cawthorn. They had their chance to tell the truth like I did. I told the truth and wasn’t indicted. Had they told the truth, it may have been a different story for them. I might say at this time that, in regard to the affidavit or statement that Mr. Looney and Mr. Brothers wanted me to sign, they were so anxious to have me sign it that they had a Catholic Priest friend of mine to call on me and get me to sign it, which I would not do. I do not care to divulge the name of this Priest, but both Mr. Looney and Mr. Brothers know the name of this Priest.”
In weighing the testimony so far outlined, there are certain circumstances which strike us rather forcibly. First, concerning Brothers’ testimony, we have cause to wonder why he would have been the person Oliveira selected in whom to confide his deep regret and remorse for the wrong he had done and practically confess an offense for which he could be ' severely punished. As we have previously stated, no particular friendship is shown to have existed between them. The record does not disclose, nor do we know of Brothers’ interest in any of the parties who had been convicted in the jury tampering case but his actions certainly bespeak some interest and one may well speculate on the notion whether or not he, as Oliveira says, was not the one who first broached the idea about perjury having been committed. In the second place, it is to be noted that Mr. Looney testifies that, when Oliveira told him that the Federal Agents had instructed him to say that he had seen Burton several times, when as a matter of fact, he had never spoken to him at any time, he told Oliveira that he did not represent Burton and that he was interested in knowing whether he had seen Cawthorn on a particular occasion or at any other time and all that Oliveira answered was “I can’t remember that”. Mr. Looney’s interest seems to have been satisfied with that answer, which surely would not constitute proof sufficient in law to convict anyone of perjury. Another striking circumstance grows out of the fact that, assuming Mr. Looney and Mr. Brothers, and the defendant Cawthorn as well, (because the information they had was imparted to him) were convinced that Oliveira had perjured himself, neither Cawthorn, himself, nor Mr. Looney, his attorney, ever took any •Steps whatsoever to try to redress the great wrong which had been perpetrated.
*903 The Commissioner seems to have been impressed with this circumstance for, although he states that he did not believe Oliveira’s testimony when he denied much of what Looney and Brothers both testified he had said in Mr. Looney’s hotel room, he adds that, nevertheless, that is a matter of no vital consequence “for the reason that this new matter could have been, and in the opinion of the Commissioner should have been, used in an application for a rehearing directed to the District Court of the United States; there is ample time during which respondent Cawthorn could have availed himself of this remedy.” We will not go as far as the Commissioner in speculating what could have been the result had this “new matter”, as he calls it, been incorporated in an application for a rehearing in the United States District Court at the time it was discovered but, from Mr. Looney’s testimony, we learn that an application for parole had not yet been made by the defendant. When Mr. Looney is asked whether any representations concerning these matters were made to the parole authorities, he says he doesn’t know, that Mr. Cawthorn will have to tell about that. In testifying before the Commissioner Cawthorn was asked why he didn’t file, with his application for rehearing on the denial of a writ to the Supreme Court of the United States, a supporting brief embodying the alleged statements of Oliveira, and his explanation was that the application was filed by his attorneys in New York, after he had surrendered to the Marshal, and he didn’t have access to those attorneys. It seems to us that with information so vital to his case, he could have found some means of transmitting it and, really, his explanation is not very impressive. He never did state, however, why he did not use the information in his application for parole, if he was so convinced that he had been convicted on the perjured testimony of Oliveira.
Other than this, and as far as is pertinent to the issue, Cawthorn testified that the evidence he gave at the conspiracy trial was correct in every respect. The effect of this, naturally, is to contradict the testimony of Oliveira as given at that trial and to support his charge of perjury in this proceeding. This, then, brings into contrast the testimony of both and raises the question of the veracity of each.
The Commissioner, as we have already shown, did not believe Oliveira. Let us assume for the moment that he is unworthy of belief and see where that leads us with regard to Cawthorn’s veracity.
As was stated before, Cawthorn placed his reputation for honesty, integrity and veracity at issue by calling ten witnesses to testify in his behalf with the result that two of these witnesses who were district judges stated that his reputation was not good, another district judge and a district attorney said they were not qualified to testify on the point and of the remaining six, one was also a district attorney who said his professional conduct was good. The *905 other four were attorneys and one the mayor of Logansport, near where defendant lives. Of these last four, one attorney and the Mayor of Logansport testified favorably — the other two gave rather qualified statements.
On the other hand, the Committee called twenty-five attorneys residing and practicing law in Shreveport and Mansfield. Cawthorn resides in Mansfield but he practiced law in both cities. Twenty-four of these lawyers testified unfavorably. The other was not in a position to state his opinion because he had not heard the defendant’s reputation discussed during the time to which the Commissioner had restricted the testimony on this point. In the light of all this testimony it is impossible to attach any more weight to the veracity of the respondent than to that of the witness Oliveira.
We have read the testimony which Oliveira gave in the trial of the criminal case in order to better appraise his testimony given by deposition in this proceeding. It impresses us as being straightforward and plausible. He was subjected to rigorous cross-examination by eminent counsel and his testimony in chief was left unshaken. This, in our opinion, lends weight to his present testimony. Moreover, no motive appears and none has been shown why he would have concocted the story he told which, besides bringing about the conviction of persons he had absolutely no personal feeling against, might have been the cause of his own prosecution for perjury.
Another thought that occurs to us is whether the defendants were convicted solely on Oliveira’s testimony and, in connection with this thought, our attention is directed to the opinion of the United States Circuit Court of Appeals in which the conviction of the defendant and the others had been affirmed. The decision of that Court is reported in the Federal Reporter, Burton v. United States, 175 F.2d 960, 964. There we find that this same contention had been made on behalf of the defendant but was found to be without merit. We find the Court stating that Oliveira’s testimony was corroborated by the witness Astorias “on the important fact that money was sent by Burton to LaBranche as Oliveira testified Cawthorn and Burton had agreed would be done. * * * Moreover, Walmsley’s testimony, he not being in any degree a conspirator, tends to show Cawthorn was active in a general plan to influence jurors other than LaBranche”.
We deem it unnecessary to say anything more — unless it be to refer to the suggestion that the jury was practically coerced by the trial judge in bringing in a verdict against the defendant and two of his co-conspirators. The suggestion arises out of the fact that the jury was held in custody for deliberation from noon on Saturday, May 15, 1948 until Tuesday, May 18, 1948. That, however, is a matter which in no way affects the question of misconduct, the *907 only one at issue in this proceeding.' Moreover, we may add that there is nothing to intimate that the trial judge tried to influence the jury in any manner whatsoever.
We have concluded that the respondent has failed to sustain the burden of rebutting the prima facie case of misconduct which arose out of his conviction , of the felony for which he was tried in the United States District Court. Even the Commissioner, who was very liberal in favor of the respondent in his rulings, evii dently was of the opinion that he had not carried that burden since he recommended his suspension for a period of five years. We cannot agree with this recommendation. This misconduct growing out of the felony for which respondent was convicted, and which he has not refuted, is of a most serious nature and one which strikes at the very foundation of our judicial system. It involves the grossest sort of moral turpitude. A lawyer, more than any other citizen, should set the example and be the leader in upholding the proper administration of justice in our courts and any lawyer who transgresses the law by obstructing our judicial processes is unworthy of the dignity of the profession. He merits nothing • less than disbarment.
It is our studied conviction that the respondent has been guilty of such misconduct in this case as to warrant his disbarment, and
It Is Therefore Ordered, Adjudged and . Decreed that the name of Joe T. Cawthorn, respondent herein, be stricken from the roll of attorneys and his license to practice law in Louisiana be and the same is, hereby cancelled.
It Is Further Ordered that the said respondent pay all costs of this proceeding.
PONDER, J., recused for reasons assigned.
Reasons for Recusation.
PONDER, Justice.
My son was Assistant United States District Attorney and counsel of record in the prosecution of the defendant of the offense, the conviction of which is relied on as prima facie proof of the defendant’s misconduct. The defendant contends that he did not commit the offense and that he was wrongfully convicted.
In order to avoid any question as to the propriety of my participating in this case, I will take no part.
FOURNET, Chief Justice.
I fully agree with the holding of the majority that we are not here reviewing the judgment of conviction in the United : States Court for the Eastern District of Louisiana. It is not the province of this court — and, indeed, we do not have the authority — to pass judgment on the way the case was handled there. The charge, the conviction, and the sentence in the federal court are a fait accompli, the defendant having served his sentence thereunder. *909 Our only concern with that conviction in this proceeding is that it forms the basis for the institution of this disbarment suit.
I also concur in the view that under section 12 of Article XIII of the Articles of Incorporation of the Louisiana State Bar Association, adopted by this court pursuant to its exclusive original and constitutional jurisdiction in disbarment cases involving misconduct of members of the bar, such a conviction “may, without further evidence,” if in the opinion of the court the case warrants such action, be sufficient to cause the cancellation of the convicted member’s license to practice law in this state. And I am in full accord with the majority view that an attorney guilty of the acts on which the conviction in the federal court was based merits nothing short of disbarment. The evidence that he was guilty of such acts, however, must, under the holding of this court in Re Novo, 200 La. 833, 9 So.2d 201, 205, which is also the universally accepted rule, “be clear and convincing.” [Italics mine.]
But I cannot agree with the interpretation placed on section 12 of Article XIII and the jurisprudence thereunder (particularly Louisiana State Bar Association v. Connolly, 201 La. 342, 9 So.2d 582, 588) or the conclusion, under such interpretation, that we cannot consider in this proceeding the kind and sufficiency of the evidence on which the conviction was based, being limited to a determination of the question whether the respondent has introduced before the Commissioner appointed by us to take the testimony evidence sufficient to overcome the presumption of misconduct evidenced by the conviction.
What the court held in the Connolly case was that the expression “ ‘may, without further evidence’ merely indicates that the' court will accept the record of conviction as evidence of the misconduct of the attorney, and, after an examination of such record, * * * determine whether the acts for which the attorney has been found guilty * * * constitute such misconduct as to declare him unworthy to continue in the practice of law.” (Italics mine.)
However, in the instant case, unlike the Connolly case where the defendant plead-, ed nolle contendere (tantamount to a plea of guilty), the defendant has con-, sistently maintained his innocence throughout all proceedings in both the federal and this court, and, when asked by the trial judge in the federal court if he had a statement to make before sentence was passed thanked the judge for his fairness, but stated most emphatically he had been convicted on perjured testimony. Consequently, if it was necessary to ex-, amine the Connolly record to' determine, whether the acts committed by the convicted attorney warranted disbarment, it is, in my humble opinion, imminently more important that we do so in this case so that-we may properly weigh the testimony in determining whether it was clear and strong and convincing of the misconduct charged.
*911 This is the responsibility that is placed squarely upon our shoulders by the Constitution, and our oath of office demands that we carry out this mandate. We cannot, and we are not authorized, to substitute the conclusions of a jury of 12 men for our judgment. This is, in fact, tantamount to surrendering to ordinary laymen unversed in the law our constitutional responsibility and our judicial prerogatives. The danger inherent in such action is forcefully emphasized by the statement of Judge Hutcheson of the Fifth Circuit Court of Appeal of the United States, and its presiding judge, in his dissent from a refusal to granting a rehearing, that on a certain phase of the federal trial error of such a highly prejudicial nature was committed that it was “contrary to common fairness as understood by every standard of American justice and due process of law.” Burton v. United States of America, 176 F.2d 865, 867. See, Selling v. Radford, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585.
Consequently, when the majority opinion was handed down before I had had an opportunity to read the record, consisting of some 2,278 pages in 5 volumes (exclusive of the briefs and the record of the proceedings before the Commissioner), I could not intelligently discuss the matter and, in the light of my oath, could not conscientiously participate in the action of the majority. This was particularly true since the Commissioner, who was not only appointed by us to receive this testimony but also instructed in 'the order appointing him to give us the benefit of his findings of fact, concluded, after carefully examining the entire record and analyzing the testimony of all of the parties that the witnesses for the prosecution in the federal court had been completely impeached or found to be otherwise unworthy of belief, giving us the benefit of his painstaking and laborious task in pointing out the reasons upon which this conclusion was based. It necessarily follows that although this report is not binding on the court, it should be most persuasive to the individual members thereof unless and until it is demonstrated by proper showing that he erred in these conclusions. And this, in my opinion, can only be done by a proper analysis of all of the evidence tending to establish the misconduct of the defendant, whether taken during the trial of his case or before the Commissioner.